Filed 1/13/21  Verotel Merchant Services B.V. v. Rizal Commercial Bank CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| VEROTEL MERCHANT SERVICES B.V., et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>RIZAL COMMERCIAL BANK, et al.,<br><br>    Defendants and Appellants. | B276120 consol'd. with B281869<br><br>(Los Angeles County<br>Super. Ct. No. BC467109) |

APPEAL from a judgment and post judgment orders of the Superior Court of Los Angeles County, Michael J. Raphael, Judge.  Affirmed.

David Steiner & Associates, David Paul Steiner; Rome & Associates, Eugene Rome; Greines, Martin, Stein & Richland, Robert A. Olson and Gary J. Wax for Plaintiffs and Appellants.

Bahar Law Office, Sarvenaz Bahar for Defendants and Appellants.

## INTRODUCTION

This appeal involves multiple entities engaged in processing internet credit card purchases in three roles: a merchant, a bank, and an intermediary agent between them. Defendant Bankard, Inc. (Bankard) is a banking institution based in the Philippines. Bankard, together with its parent, defendant Rizal Commercial Banking Corporation (Rizal),[1] acted as the bank in processing credit card transactions for internet merchants between 2004 and 2006.

Plaintiff Verotel Merchant Services B.V. (VMS), together with its Philippines-based subsidiary, Verotel International Industries, Inc. (VII), operated as a merchant, sending internet credit card purchases to accredited banks for processing and payment. Plaintiffs contend that VMS sent its credit card transactions to defendants for processing from 2004 to 2006, using an agent of the bank as an intermediary to handle the transactions. Thus, VMS sent credit card purchases made on its websites through the agent to the bank, the bank received payment for those purchases from the credit cardholder's own bank, and the bank paid VMS for the purchases. For its services, the bank charged VMS transaction fees and subtracted these fees from the payments sent to VMS.

For most of the relevant period, Janet Conway acted as an intermediary in VMS's transactions with the bank. In addition, several entities she owned or controlled performed various services in connection with the bank's card processing services. Plaintiffs contend they believed Conway was working as an agent of the bank. After the credit card Associations suspended defendants' online processing business in 2006 for violating their rules, plaintiffs discovered that the bank's transaction fees were actually lower than the rate Conway had represented, and Conway had pocketed the difference.

Plaintiffs sued defendants, alleging that defendants used Conway and the entities she owned to manage their online credit card processing business and were therefore liable for her actions. Plaintiffs alleged they were

---

[1]The parties largely treated Bankard and Rizal as a single entity in this case. We refer to them collectively as "defendants" or "the bank."

damaged in the amount of almost $1 million in unpaid fees.  Plaintiffs also contended defendants failed to repay other money owed, resulting in a total claim of $1.5 million in damages.

For their part, defendants contend that Conway was never defendants' agent, but rather acted as *plaintiffs'* agent while defrauding the bank. Defendants also claim that they never had any relationship or agreement with VMS.  Instead, they assert that VMS and Conway knowingly submitted VMS's transactions under a contract Bankard had with a different merchant, Grupo Mercarse Corp.  According to defendants, they paid Grupo Mercarse for those transactions, and if VMS suffered losses while acting improperly as a sub-merchant in violation of the Associations' rules, that was not the bank's responsibility.

The jury found in favor of plaintiffs on all causes of action and awarded VMS compensatory and punitive damages.  Defendants filed a motion for judgment notwithstanding the verdict (JNOV) and for a new trial.  The court granted the motion for JNOV in part, striking the punitive damages award, but denied the remainder.  The court also awarded cost of proof sanctions against defendants under Code of Civil Procedure section 2033.420[2] for several factual denials made by defendants during discovery.

Defendants appealed from the entry of amended judgment and the trial court's order awarding sanctions.  Plaintiffs appealed from the court's order striking the punitive damages award.  We consolidated the appeals for all purposes.

In defendants' appeal, they contend that the statute of limitations bars plaintiffs' claims and that  VMS lacks standing to sue.  They further argue that there was insufficient evidence of agency or causation to support the jury's verdict and that the trial court erred in making several evidentiary rulings at trial.  Finally, they assert that the trial court abused its discretion in awarding cost of proof sanctions against them.  In plaintiffs' appeal, they contend that the court erred in overturning the jury's award of punitive damages, as there was sufficient evidence that Conway was a managing agent for defendants.

---

[2]All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

3

We conclude neither party has met its burden to establish error. We therefore affirm.

## FACTUAL AND PROCEDURAL HISTORY

**I.** ***Structure of Online Credit Card Transactions***

The rules governing credit card purchases are set by credit card associations/networks Visa and MasterCard (the "Associations"); these rules set "the infrastructure under which all the transactions flow." In general, there are four parties to every credit card transaction: (1) the credit card holder (the consumer); (2) the issuing bank (the cardholder's bank); (3) the merchant; and (4) the acquiring bank (the merchant's bank). An acquiring bank must be a member of the Associations in order to process credit card payments; in return, the bank agrees to abide by the Associations' rules. When a consumer makes a purchase using a credit card, the acquiring bank acquires the credit card transaction, pays the merchant (minus fees and charges), and receives payment from the cardholder's issuing bank (which, in turn, charges the consumer).

The Associations' rules require acquiring banks to have written merchant agreements with each merchant from whom it acquires transactions, which are called tripartite merchant agreements (TMAs). The bank then issues a merchant identification number (MID) to a merchant to allow the merchant to submit transactions for processing and allow the bank to track those transactions. In exchange for its processing services, the bank charges the merchant a transaction fee—here, a set percentage of the transaction amount as well as a per-transaction charge. The bank deducts these fees from the amount it pays the merchant; thus, the merchant receives less than the face value of the transaction.

If a customer seeks a refund for a purchase (also called a "chargeback"), and the merchant does not issue a refund, the acquiring bank is responsible. Accordingly, the bank may hold a certain amount in reserve from the merchant in order to cover any refunds. Also, if a merchant engages in illegal or "brand damaging" transactions, it could result in a fine from the Associations to the acquiring bank, which the bank may pass on to the merchant.

4

The acquiring bank may use intermediaries as agents to handle some components of this process. These third parties are called independent service organizations (ISOs) or member service providers (MSPs)[3] and must be registered in this role with the Associations. Under the Associations' rules, some duties cannot be delegated to an ISO and must be performed by the member bank. Such non-delegable duties include settlement (i.e., payment for transactions) and approval of merchants for processing. Aspects of the merchant-bank relationship that can be delegated to a registered ISO include routing transactions for processing from the merchant to the bank.

Purchases made with a credit card online or over the telephone are called "card-not-present" purchases, as the merchant does not physically view the credit card. This type of purchase carries a higher risk for fraud, because the merchant cannot confirm the cardholder's identity. As such, fewer banks are willing to process card-not-present transactions, and those that do charge higher fees.

## II. *The Parties*

Plaintiff VMS is a Netherlands corporation that operates as an internet payment service provider, providing payment services for merchants selling content on websites. Plaintiff VII is a Philippines corporation and, according to plaintiffs, is VMS's wholly-owned subsidiary. According to plaintiffs, from 2004 to 2006 VMS acted as the merchant in a processing relationship with defendants, sending transactions from VMS's websites to the bank through the bank's ISO.

Defendant Rizal is a Philippines corporation and a member of the Associations. Defendant Bankard is a Philippines corporation and Rizal's wholly-owned subsidiary. Defendants processed card-not-present transactions from 2004 through October 2006, when its processing rights were suspended by the Associations for various violations of the Associations' rules.

## III. *The Parties' Claims and Pleadings*

### A. *Overview of Claims*

Although they do not expressly acknowledge any agreement, both parties' pleadings alleged misconduct by Conway and related third parties,

---

[3]These terms were used interchangeably throughout trial.

none of whom were ultimately involved in the litigation. Both plaintiffs and defendants contend that defendants' card-not-present processing business began as a proposal by Conway and two associates, Michael Conway,[4] and Simoun Ung, to use several of their companies as intermediaries between defendants and merchants. Sometime between 2003 and 2005, Conway, Michael, and Ung presented defendants with a business model in which CNP Worldwide, Inc. (CNP) would act as Bankard's official ISO for its card-not-present processing business, conducting merchant solicitation, customer service, and other services for Bankard. As alleged by defendants, under this business model, CNP would act as the "hub in a wheel," surrounded by other companies acting as "independent third party providers of services" for CNP and Bankard. These companies included Merchant Risk Recovery, Inc. (MRRI), which vetted new merchants proposed by CNP; Grupo Mercarse, which acted as the merchant; and its affiliate, MerCarSe, which handled payment from the bank to merchants. The parties also both alleged that Conway, Michael, and Ung owned and controlled Grupo Mercarse, MerCarSe, and MRRI. The parties agree that Ung served as CNP's chief executive officer. Plaintiffs contend that Conway also owned or controlled CNP, which defendants dispute.

Defendants claim that they agreed to participate because the business model was presented as a legitimate, "'profitable, self-sustaining business conceptual product' with the necessary third party quality control and risk assessment servicing entities." As such, defendants claim they were unaware that Grupo Mercarse, MerCarSe, and MRRI shared ownership or that "they were self-dealing and acting in direct contrast to the interests of Bankard and innocent third parties."

While the parties dispute who knew what and when they knew it, they agree that the shared ownership and control of these entities was problematic. It enabled Conway and her associates to both solicit and "independently" vet new merchants, including Conway's own company Grupo Mercarse, which functioned as a "master merchant" between the bank and numerous sub-merchants. Similarly, it allowed Conway to control

_____

[4]We refer to Michael Conway by his first name to avoid confusion. He is described in the record as either Conway's husband or stepson.

distribution of all payments made by the bank through MerCarSe. Ultimately, this allowed Conway to abscond with funds due to merchants, including plaintiffs.

However, the parties dispute key factual issues. Defendants contend that all of the transactions at issue here were processed under two agreements. First, there was a TMA signed in February 2005 among the bank, Grupo Mercarse as the merchant, and CNP as the ISO (the Grupo TMA). Second, there was a TMA among the bank, VII as the merchant, and Grupo Mercarse as the ISO (the VII TMA), which plaintiffs signed in December 2005. The bank never signed the VII TMA. It later claimed this was because the TMA contained several "clerical" errors, including the listing of Grupo Mercarse, rather than CNP, as the bank's ISO. We discuss the relevant provisions of these agreements further below.

Defendants contend that prior to the VII TMA, they processed and paid for all relevant transactions under the Grupo TMA. They assert that VMS's claims for losses relating to those transactions are improper, as VMS was improperly "aggregating" its transactions under Grupo Mercarse's contract at the time. Further, defendants contend that they acted properly under the VII TMA, because Bankard sent payment for those transactions to MerCarSe's bank account, in full compliance with the terms of the VII TMA. As to Conway's theft of money owed to plaintiffs under either of these agreements, defendants contend they are not responsible, because Conway actually was acting as plaintiffs' agent and defendants performed their duties under the TMAs.

For their part, plaintiffs dispute that they submitted their transactions under the Grupo TMA. Instead, they contend they had a direct processing relationship with defendants starting in 2004 and continuing unabated through 2006, altered only to the extent that Conway secured them a reduced processing rate in mid-2005. Plaintiffs also contend that defendants improperly delegated the entire operation of the card-not-present processing business to Conway and her companies, in violation of the Associations rules. In doing so, the bank used Conway and her companies as its agents, thus enabling Conway first to solicit plaintiffs' business and then to steal plaintiffs' funds. In addition to the money stolen by Conway, plaintiffs

contend defendants failed to repay some of their reserves upon termination of the relationship.

B.  *Complaint*

Plaintiffs filed their complaint on August 8, 2011 against Rizal, Bankard, Grupo Mercarse, CNP, Ung, and CNP employee Joy Martinez.[5] They alleged causes of action for fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, money had and received, accounting, conversion, unjust enrichment, and breach of trust. They attached to the complaint a copy of the VII TMA, signed by Paul Kraaijvanger as president of VII.

Plaintiffs filed a first amended complaint (FAC) in June 2013, adding a ninth cause of action for negligence against Bankard and Rizal. In the FAC, plaintiffs alleged that VMS had been "an internet payment service provider for websites on the internet since 1997." Plaintiffs alleged that Bankard began processing transactions for VMS in October 2004 "without a written agreement in place." In 2005, based on instructions from Conway, VMS incorporated affiliate VII in the Philippines to serve as the merchant of record with Bankard. VII then signed the VII TMA with Bankard, designating VII as the merchant, Bankard as the member bank, and Grupo Mercarse as the bank's agent. Plaintiffs later learned that Bankard refused to sign the VII TMA because of "glaring defects" in the agreement, including the designation of Grupo Mercarse as the agent when it was not registered to serve that function, and the designation of MerCarSe as the payee for all funds due to plaintiffs. However, Bankard "proceeded to act under the very agreement it rejected, because it processed Plaintiffs' transactions and paid out all proceeds" to MerCarSe.

The FAC alleged that MasterCard issued several warnings to Bankard that ISOs were not allowed to control merchant funds. On September 20, 2006, MasterCard terminated Bankard's accreditation for card-not-present processing, "as a result of its repeated violations" of the Associations' rules. Plaintiffs claimed defendants improperly retained possession of over $1.5

---

[5]Plaintiffs ultimately dismissed Grupo Mercarse, CNP, Ung, and Martinez without prejudice from their complaint. It does not appear that any of these defendants ever appeared in the case.

million of plaintiffs' funds and ignored plaintiffs' requests to return the money after the processing relationship ended. Plaintiffs also sought punitive damages.

      C.    *Cross-Complaint*

      Rizal filed a cross-complaint in June 2012 against plaintiffs, Kraaijvanger, Ung, Grupo Mercarse, CNP, MerCarSe, MRRI, Conway, Michael, and multiple other individuals and entities. The cross-complaint alleged, in pertinent part, that Conway was a "shareholder, director and/or officer" of MerCarSe, MRRI, and Grupo Mercarse, and that those companies shared the same shareholders, directors, officers, and employees. Defendants also alleged that all of the cross-defendant entities were "own[ed], operated and controlled by Conway, Michael, and Ung" and were their alter egos.

      Conway, Michael, and MRRI moved to quash service of the summons and cross-complaint. The court granted the motion in August 2013, dismissing them as cross-defendants. Based on the evidence before it, the court found that defendants failed to meet their burden to establish personal jurisdiction over Conway, including by failing to show that Conway was ever an officer, director, shareholder, or employee of Grupo Mercarse.

      Defendants moved to amend their cross-complaint in August 2013 to add Bankard as a cross-complainant and to correct "factual allegations to conform to the evidence learned during discovery and in the course of litigation." The court granted the motion and defendants filed an amended cross-complaint. Defendants again alleged that Conway was an officer, director, or shareholder of MerCarSe, MRRI, and Grupo Mercarse.

      Defendants alleged causes of action for accounting and breach of fiduciary duty against plaintiffs and Kraaijvanger, and for fraud, conversion, breach of fiduciary duty, accounting, promissory estoppel, and unjust enrichment against the other cross-defendants. Defendants alleged that as instructed by the Grupo TMA and VII TMA, they sent payments owed to merchants Grupo Mercarse and VII under the agreements to MerCarSe's bank account. Defendants further alleged that unbeknownst to them, Conway and MerCarSe diverted these funds and did not pay the merchants and/or commingled funds "which prevented them from properly making the correct payments to the correct entities." As a result, defendants were sued

in "multiple lawsuits" and were exposed to claims from "merchants and sub-merchants on the various TMAs." Defendants alleged that Conway, Michael Conway, and Ung intentionally designed their business model as an "intricate Ponzi Scheme," misrepresenting the nature and legitimacy of their businesses to defendants and inducing defendants to enter into the TMAs.

Defendants sought an accounting from plaintiffs and claimed plaintiffs had breached their fiduciary duties to properly account for their merchant funds and to "properly supervise their agent [MerCarSe]'s handling and management of such monies." The court granted plaintiffs' motion for summary judgment on the cross-complaint in July 2014. The remaining cross-defendants were ultimately dismissed or had defaults entered against them.

## IV.  *Pretrial proceedings*

Defendants filed a motion for summary judgment in 2013 arguing, among other things, that VMS lacked standing to sue and the complaint was untimely under the applicable statutes of limitations. The court denied summary judgment, finding triable issues of material fact as to VMS's standing and the statute of limitations.

Trial was scheduled to begin in December 2014. After a mistrial,[6] the second trial began in January 2016.

## V.  *Evidence at Trial*

Plaintiffs proceeded to trial against Bankard and Rizal on six causes of action: fraud, conversion, money had and received, negligence, breach of contract, and breach of the covenant of good faith and fair dealing. Plaintiffs called as witnesses Joost Zuurbier and Paul Kraaijvanger, VMS's co-presidents; Oscar Biason, Rizal's president and chief executive officer; Rafael Reyes, Bankard's executive vice-president and chief operating officer; Bankard employees Mylene Bico and Jane Andeza; and expert Kenneth Musante. In addition to eliciting evidence through these witnesses, defendants called experts Matthew Talbot and Justice Jose Vitug. Justice

---

[6]During voir dire, the trial judge declared a mistrial and recused herself, based on misconduct of plaintiffs' counsel related to a mandatory settlement conference.

Vitug, an associate justice of the Supreme Court of the Philippines, testified to the court outside the presence of the jury on issues of Philippine law.

A.    *Bankard begins processing card-not-present transactions*

Biason testified that Bankard became licensed as an acquiring bank for card-not-present transactions in 2004.  Reyes testified to the online payment processing business model proposed to Bankard by Conway, Michael, and Ung. Under this proposal, the trio offered to research potential merchants for Bankard, perform audit and quality control services, and ensure payment remittance was properly conducted.  Bankard then used CNP to identify and solicit merchants for the processing business.  CNP, in turn, hired MRRI, and Conway, its owner, to investigate potential merchants that CNP brought to Bankard.  CNP contracted with MRRI and submitted MRRI's investigative reports to Bankard, which Bankard used in granting final approval of merchants.  Bankard did not investigate MRRI or Conway before using them; instead, it relied on CNP to have done so.

Bico, a Bankard employee, testified that CNP was initially a merchant with Bankard but simultaneously functioned as an agent, referring other merchants to the business.  Bankard was new to the business and confused about the terminology at the time. After CNP was cited by MasterCard for not being registered as an ISO, Bankard registered CNP and signed an agency agreement in February 2005.

B.    *VMS starts sending transactions to Bankard for processing*

Zuurbier, the co-president of VMS, testified that VMS as a merchant started sending transactions to Bankard for processing in October 2004 through Gary Broadner, who said he was an agent for Bankard.  VMS's system would send transactions to CNP (acting as the ISO) and then receive an authorization code identifying the transaction as authorized.  VMS needed a MID number from the bank in order to process transactions. Bankard gave VMS a MID number through Broadner in 2004.[7]

---

[7]With respect to whether there was a written agreement between plaintiffs and defendants prior to the VII TMA, Kraaijvanger testified that "at some point there was an earlier agreement" but acknowledged that plaintiffs did not produce any such agreement in the litigation.

Starting in 2004, VMS submitted sales from its TicketsClub websites for processing with Bankard.  During this time period, VMS was operating TicketsClub as a brand for its websites, selling tickets to shows.  Zuurbier testified that the bank paid VMS weekly for these transactions by depositing funds into its bank account at Rabo Bank in the Netherlands.

Defendants claimed that VMS was submitting TicketsClub transactions in 2004 and 2005 under Grupo Mercarse's MID and without a separate merchant agreement between VMS and Bankard. Biason testified that Grupo Mercarse represented that it owned the TicketsClub website and Bankard therefore processed those transactions under Grupo Mercarse's merchant account and paid it as the merchant.  He asserted that defendants did not know VMS claimed to own TicketsClub until after litigation began.

Kraaijvanger denied that VMS was submitting its TicketsClub transactions as a sub-merchant under Grupo Mercarse. He acknowledged that VMS was processing transactions for other merchants in 2004, and therefore was "aggregating" those transactions and sending them to the bank under VMS's merchant account.  However, Kraaijvanger contended this practice complied with the Associations' rules at the time. He stated that VMS was never contacted by the bank with complaints about improperly aggregating.

C.    *The Grupo TMA*

One of the merchants CNP proposed to Bankard was Grupo Mercarse. Bankard signed the Grupo TMA in February 2005 with CNP as the agent, and Grupo Mercarse as the merchant.  The agreement included an affiliate personal guaranty agreement, with MerCarSe as the designated affiliate, signed by Conway as the guarantor.

Grupo Mercarse sent transactions from over 100 websites to Bankard for processing, out of a total of 124 websites handled by Bankard between 2004 and 2006.  Reyes testified that Bankard understood that these websites were all owned by Grupo Mercarse, pursuant to the Grupo TMA.  But he also acknowledged his prior deposition testimony that the websites were sub-merchants of Grupo Mercarse, and that Grupo Mercarse's function was to distribute the money paid by Bankard to these sub-merchants.  Reyes insisted that Bankard fulfilled its obligations under the Grupo TMA by

paying Grupo Mercarse as the merchant.  He testified that whether or how Grupo Mercarse paid its sub-merchants was "not our concern."

As set forth in the payment service schedule in the Grupo TMA, the bank charged a transaction fee rate of 3.35 percent and a per transaction charge of $0.10.  The payment provision, paragraph 2.4, provided that all money owed to the merchant would be paid by the bank "to the bank account in the name of the MERCHANT that is to be specified in writing ('MERCHANT's Account')."  Grupo Mercarse directed Bankard to send payment for all of the websites processed under this agreement into a single MerCarSe bank account.[8]  Reyes testified that this did not violate any of the Associations' rules, as long as the payment did not go to a registered ISO and went to a third party as directed by the merchant in the TMA.  According to an investigative report prepared by MRRI, Bankard knew that Conway was the president of MerCarSe.

D.      *VMS switches from Broadner to Conway*

In the summer of 2005, Conway approached VMS on behalf of Bankard.[9]  Zuurbier testified that Conway showed him marketing materials for Bankard and told him she could lower the transaction fees Bankard was charging VMS by two percent, but nothing else would change.  VMS agreed, and began sending its transactions for processing through Conway to the bank in October 2005. The bank continued to pay VMS for those transactions, deducting the lower rate  of transaction fees as Conway had promised.  Zuurbier testified that the bank paid VMS  weekly, minus the newly reduced

---

[8]Defendants contend this request was made through submission of affiliate boarding requests, which served as the "written directive to Bankard where and to whom and under whose credit payments from the TMAs should be made."

[9] During cross-examination, Zuurbier acknowledged that VMS worked with Conway on at least two occasions unrelated to the Bankard relationship: once in 2003 when she connected VMS with a bank in the Caribbean, and once around 2009 when VMS hired her to collect on a Korean processor that did not pay.  Kraaijvanger testified that in his experience, agents such as Conway would have relationships with, and serve as agents for, multiple banks.

transaction fees of 4.5 percent plus $0.20 per transaction. These payments matched the weekly statements VMS received from Conway and MerCarSe.

Zuurbier testified that he never considered Conway to be VMS's agent. Instead, he believed that "an agent in this business is always more the external salesperson for an acquiring bank trying to use his or her relationships to get transaction processing going" and that is what Conway did by acting as the "liaison" between VMS and the bank." According to Zuurbier, VMS decided to work with Conway because he believed she was the bank's representative, as evidenced by the fact that she was able to provide valid MID numbers to VMS so it could send transactions to defendants. Kraaijvanger also testified that he "absolutely" viewed Conway as an agent of Bankard, because she successfully negotiated lower transaction fees for VMS with the bank and he did not think "anybody else, except for somebody that represents that bank, can actually physically change" the amount of transaction fees the bank charged.

Biason denied that Conway was the bank's agent. He testified that the bank did not use individuals as agents, and it used only CNP for card-not-present transactions. He also denied that Grupo Mercarse ever acted as the bank's agent, claiming it was only a merchant and sent in transactions for websites it claimed it owned.

E.     *Formation of VII*

In December 2005, Conway told VMS that it needed to set up a company in the Philippines to comply with Bankard's license.[10] Zuurbier testified that Conway told him it was a formality, nothing would change, and that she and CNP would set up the company for VMS. Conway told him that she "ordered another agency to incorporate or change the name of an existing company and put the ownership in our name for compliance reasons of the bank with Mastercard." This Philippines entity was VII. According to Conway, nothing else had to be done to open VII. Meanwhile, VMS continued

_____

[10]As plaintiffs' expert explained, the Associations' rules against "cross-bordering" required that merchants work with a member in the same region where the merchant is domiciled. Thus, for VMS to process transactions with Bankard, located in the Philippines, VMS needed to have a presence in the Philippines.

to send transactions to Bankard and receive weekly payments in return. Conway provided weekly processing reports to VMS, which showed the payments from the bank coming through MerCarSe to VMS's account at RaboBank. Kraaijvanger testified that VMS never moved any accounts to VII or opened any offices under VII's name, and VMS's processing continued unchanged.

F. *The VII TMA*

1. *Plaintiffs sign the agreement*

Conway asked VMS in December 2005 to sign a written processing agreement between VII and Bankard. Kraaijvanger signed the VII TMA on December 22, 2005 as president of VII. Zuurbier testified that he understood the agreement pertained to VMS, not VII, because "we were sending in the transactions as VMS." Zuurbier testified that he saw the agreement as a formality to reflect the lower transaction fees the bank had been charging VMS since October. Nothing changed after VMS signed the TMA; it continued to send its transactions for processing to CNP, and VMS continued receiving payment for those transactions into its bank account at RaboBank.

VMS sent the signed VII TMA to Conway. Although VMS never received a signed copy of the VII TMA from the bank, Kraaijvanger testified that VMS continued to trust Conway as a bank representative because the transactions continued to flow on an uninterrupted basis, which he took to mean "that everything is in good standing."

2. *Relevant provisions*

Two versions of the VII TMA were introduced at trial—one version that VMS reviewed and signed and one that the bank received from Conway, but never signed.

The provisions of the agreement itself were the same on both versions. The agreement listed three parties: Bankard as the member bank, VII as the merchant, and Grupo Mercarse as the agent. Kraaijvanger testified that this was consistent with his understanding of the relationship between Grupo Mercarse and Bankard. The agreement further stated that "AGENT and MEMBER [i.e., the bank] each desire that AGENT perform services, on behalf of MEMBER," and that under the agreement, "the AGENT is the

15

exclusive agent of the MEMBER; [and] the MEMBER is at all times and entirely responsible for, and in control of, AGENT['s] performance."

The agreement also provided that Bankard would hold cash reserves of 10 percent of gross sales volume as security against any merchant liabilities, to be repaid to VII on a rolling basis after six months. Upon termination of the relationship, Bankard would retain the money in the merchant's reserve account for "a minimum period of six months" and thereafter repay the balance in the account according to a specified schedule. The agreement restricted the agent from "access, directly or indirectly, to any account for funds or funds due to MERCHANT and/or funds withheld from MERCHANT for chargebacks arising from, or related to, performance of this AGREEMENT." The agreement also barred Bankard from assigning or transferring to its agent the obligation to pay or reimburse the merchant under the agreement.

The payment provision, paragraph 2.4, stated that all money owed to the merchant (VII) under the agreement would be paid weekly "from MerCarSe's account in the Merchant's name at MerCarSe," and further that Bankard would deduct any applicable Philippine taxes from its payments to VII. This provision notably differed from the payment paragraphs contained in both the Grupo TMA and a template TMA that Mastercard had approved for use when it approved CNP as the bank's ISO in 2005.[11] Specifically, the VII TMA directed Bankard to pay MerCarSe, rather than VII, and omitted the language requiring payment to be made "by the MEMBER" (Bankard). In addition to directing payment to be made by MerCarSe, paragraph 2.4 of

---

[11]Both the Grupo TMA and the template contained a payment provision providing that all money owed to the merchant will be paid by the member bank "to the bank account in the name of the MERCHANT that is to be specified in writing ('MERCHANT's Account'). Payment will be made by the MEMBER, except in those cases where 1) funds are not settled by the AGENT processor and/or member due to technical delays outside AGENT's control (in which case AGENT will notify the MERCHANT . . .) or 2) if the MEMBER and/or AGENT in its sole discretion, determines that certain funds should be withheld. . . . The MEMBER and/or AGENT will not withhold payment unreasonably."

16

the VII TMA listed "MerCarSe" in all of the places where the template and the Grupo TMA referred to the bank's "AGENT."

Both versions of the VII TMA contained Kraaijvanger's signature for VII. Both versions also included a blank signature line for Biason on behalf of Bankard. However, defendants' version of the signature page also included a signature by Michael Conway as president of Grupo Mercarse (the agent).

The two versions contained other key differences. First, plaintiffs' version of the agreement included a "payment service schedule" listing the transaction fees at $0.20 per transaction, plus 4.5 percent (also called a "merchant discount rate"). Defendants' version included a different payment services schedule, listing transaction fees of $0.10 per transaction and a merchant discount rate of 3 percent. Second, plaintiffs' agreement included a sheet of payment instructions directing payment to VII's account at RaboBank. On defendants' version, the page of payment instructions was missing.

Bankard's version also attached a list of websites and a warranty, purportedly signed by Kraaijvanger, that the websites listed were owned by VII. Zuurbier testified that the list, which was omitted from plaintiffs' version, included some websites that were not owned by or affiliated with plaintiffs. Both Zuurbier and Kraaijvanger testified that Kraaijvanger's signature was forged on the portions of defendants' version of the TMA that differed from plaintiffs' version.[12]

### 3. Defendants refuse to sign the agreement

Biason acknowledged that in general, Bankard would sign a TMA before starting to process transactions for a merchant, and that it was a requirement of the Associations to have a signed processing agreement in place before processing began Reyes agreed that as a general practice, Bankard would have the merchant sign the TMA first, then CNP, then Bankard, as the "final line of defense" to approve the merchant before beginning to process its transactions. However, both Biason and Reyes testified that Bankard did not sign the VII TMA because the agreement contained a "clerical error" or "typographical error" listing the agent as Grupo

[12]Defendants did not challenge plaintiffs' claim that they never approved or signed defendants' version of the agreement.

Mercarse. Bankard did not have an agent by that name and its only agent was CNP. Reyes also noted that it was irregular for the VII TMA to direct that payment be sent to MerCarSe, and stated this was one of the reasons Bankard did not sign the VII TMA.

Despite acknowledging these errors and irregularities, defendants admitted that Bankard processed VII's transactions under the unsigned TMA. Specifically, defendants claimed that Bankard processed these transactions under the payment services schedule (in the bank's version of the agreement), where there were agreed terms, including the amount of transaction fees. Biason and Reyes also acknowledged that Bankard sent payment for VII's transactions to MerCarSe pursuant to the agreement terms. Biason claimed that the bank paid MerCarSe as VII's agent. Bankard charged transaction fees of 3 percent and $0.10 in accordance with the payment services schedule on Bankard's version of the VII TMA.

Zuurbier testified that VMS was charged transaction fees of 4.5 percent and $0.20, reflected in the version of the VII TMA that plaintiffs reviewed and signed, and matching the rate VMS had been charged by Bankard since October 2005, when VMS began processing through Conway. This was a higher percentage than the amount the bank charged under its version of the VII TMA. Zuurbier believed that Conway pocketed the difference between the amount the bank charged and what VMS ultimately received.

Plaintiffs never received a fully executed copy of the VII TMA and were never told that Bankard had refused to sign the agreement. Plaintiffs only discovered defendants' version of the VII TMA after commencing litigation. Accordingly, Kraaijvanger testified that he was under the impression that the agreement he signed and sent in to the bank "was the basis upon which we were processing already and receiving payments, and that matched up with . . . the charges that were being charged by the bank. And I thought it represented the relationship as . . . it was already happening."

According to both Biason and Reyes, Bankard communicated with CNP about the issues with the VII TMA, and it was CNP's job to deal with the merchant. Biason agreed that the issue should have been resolved "much earlier."

G.  *The end of the processing relationship*

VMS continued to process with Bankard until the end of October 2006, when VMS learned from Conway that Bankard had lost its license with Visa and MasterCard.  At that point, VMS noticed that it was missing money from transactions starting in April 2006.  In early 2007, Zuurbier asked for a reconciliation report, which was prepared by VMS employee Rico Vogel.  The report used VMS's own Oracle database, which listed all the transactions VMS sent to CNP for processing with the bank and the authorization codes for those transactions received from Visa and MasterCard.  VMS compared that data with the transactions reported on the spreadsheet provided by Conway, which Zuurbier understood reflected the data supplied by Bankard, through Conway as its representative.  The reconciliation report showed no significant discrepancy between the data in 2004 and 2005.  Beginning in April, 2006, there were larger discrepancies, with VMS getting "heavily underpaid."

Once VMS reconciled the millions of transactions, it discovered discrepancies totaling an underpayment of $975,036. After losing its license, Bankard also failed to repay VMS about $500,000 from VMS's reserves. There was also about $26,000 owed to VMS related to chargebacks. In total, Zuurbier testified that Bankard owed VMS $1,526,169.01.  Although defendants claimed they withheld some funds to pay taxes for plaintiffs in the Philippines, Kraaijvanger testified he never received any evidence that any such taxes were paid.

Reyes testified that Bankard performed an accounting to analyze all of the sales processed under the Grupo TMA and VII TMA.  According to Bankard, the TicketsClub transactions were processed under the MID number issued to Grupo Mercarse under the Grupo TMA.

H.  *VMS's actions to recoup its funds*

After VMS realized it was missing money from Bankard in early 2007, Zuurbier spoke to Conway about recovering the money owed. VMS paid Conway's company, MRRI, a $6,000 retainer to try to collect the debt.  He testified that Conway "kept us a little bit on the leash" in early 2007 and VMS received two partial reserve repayments that year.  VMS continued to work with Conway  to recover its funds.  In December 2007, Conway

19

suggested that VMS retain the law firm of Baker McKenzie in an attempt to retrieve what Bankard owed. The firm purportedly had a "personal relationship" with the Yuchengco family, which owned Bankard. Zuurbier testified that at this point, he believed Conway was acting on behalf of Bankard. She told him the law firm was engaging in "discussions" with the Yuchengco family and she would keep VMS apprised of any progress. Kraaijvanger testified he thought Conway was working to get VMS's money and he felt this was the best route to "hopefully get this resolved in an amicable way."

By the spring of 2008, Baker McKenzie had not netted any further recovery of VMS's money, so Zuurbier again reached out to Conway. In April 2008, Conway told him she was still handling the case and that "MerCarSe was trying to see what they can do with the Yuchengco family to obtain the money or make Bankard pay." A short while later, Kraaijvanger took over the relationship while Zuurbier was out of the country. Kraaijvanger testified that he met with Conway in 2009 to discuss the issue, and she said she "was working on it." After Zuurbier returned in September or October 2009, he got an update from Conway by phone or email regarding the "financial situation of Bankard and the moneys owed." Zuurbier set up a meeting with Conway in London in May or June 2010. She did not show up and stopped responding to his phone calls. After that, VMS "began preparing ourselves for a lawsuit."

I.      *Bankard's indemnity agreement with CNP*

Plaintiffs claimed that Bankard failed to return all of their reserves owed, and instead improperly sent that money to CNP in 2008. Biason testified that Bankard was unhappy with CNP because of Bankard's license suspension, and Bankard therefore terminated its sponsorship of CNP as an ISO in September 2008. Nevertheless, Bankard entered into an indemnity agreement with CNP in December 2008, under which the bank stated it retained possession of over $1.1 million in funds from its card-not-present transactions, and CNP warranted that these funds would be used for settling obligations of the merchants, including "various tax liabilities" due in the Philippines. Bankard therefore agreed to release the funds to CNP for the purpose of paying those liabilities, as well as for fees and charges due under

the applicable TMAs. CNP, in exchange, agreed to defend and indemnify the bank. The funds identified included almost $24,000 for plaintiffs and over $37,000 for "Mercarse."

Biason testified that the funds sent to CNP in 2008 were "no longer merchant funds," but rather taxes. He stated that the government in the Philippines directed Bankard to pay the $1.1 million in funds to CNP as the withholding agent. Reyes similarly testified that Bankard no longer considered the funds to be due to the merchants. CNP was no longer acting as an ISO, but instead was handling payments owed to the tax authorities. Defendants did not introduce any documents at trial demonstrating that CNP ultimately paid the taxes as promised.

J.      *Expert testimony*

Plaintiffs' expert, Musante, opined that defendants violated the Associations' rules in multiple ways. He noted that Grupo Mercarse was listed as the agent in the VII TMA, although that entity was not a registered ISO. He also pointed to the provision directing payment through MerCarSe, which he concluded violated the Associations' rules because it gave control of merchant money to a third party, rather than providing payment directly to the merchant. Moreover, that third party was not a registered agent and did not even appear to be a signatory to the agreement, which was a "huge issue." Musante testified that he did not "understand [in] what world or what universe Bankard could have looked at the rules . . . and put together the contract that they did and tried to service it in the way in which they did and not know that they were operating outside of the rules."

In addition, Musante opined that defendants violated the Associations' rules by processing plaintiffs' transactions without a signed TMA. He testified that defendants should have notified the merchant that there was a problem and stopped processing. Based on his review of documents in the case, Musante testified that he believed Bankard did not sign the VII TMA because it knew the agreement did not comply with the rules, although it still proceeded to process transactions under its terms.

Musante also took issue with defendants' payment of merchant reserves, including some from VMS, to CNP after it was no longer authorized as an ISO in 2008. He opined that it violated the Associations' rules in

multiple ways: (1) holding the reserves between 2006, when defendants stopped processing, and late 2008, rather than repaying the merchants; (2) paying the reserves to a third party rather than directly to the merchants; and (3) paying a third party that was no longer in good standing.

Musante also compared the VII TMA with the Grupo TMA between Bankard, CNP as the agent, and Grupo Mercarse as the merchant. He noted that the Grupo TMA had a compliant payment provision where the money was going directly to the merchant, rather than to a third party as provided in the VII TMA.

When questioned about defendants' contention that VMS violated the Associations' rules by aggregating transactions, Musante noted that "regardless of whether that is true or not, the bank must pay the merchant. If they are processing for the merchant, they must pay the merchant." He also discussed his review of documents suggesting that Bankard knew VMS was acting in a non-conforming manner by managing other websites and acting as the merchant.

In addition, Musante testified that it was improper for Bankard to hire MRRI to investigate merchants and use a related company, CNP, as an agent, as Conway was an owner of both MRRI and CNP. Musante also testified that it was "extremely rare" for a bank to have its privileges suspended by the Associations, and that Bankard was operating "far outside of the norms" in terms of charge-back and fraud ratios. According to Musante, Bankard's charge-back ratio at the time from their card-not-present portfolio was more than 30 times the average and its fraud ratio was more than 16 times the average. He opined that Bankard had an "exceedingly excessive" number of violations, which resulted in the termination of defendants' processing and led to VMS's losses.

Defendants' expert, Talbot, testified that VMS was operating as an internet payment service provider, which "provides some form of technology and processing that allows websites, submerchants . . . to basically channel transactions to various acquirers." But he saw no evidence that VMS obtained the required approval to operate as an internet payment service provider during that period. Talbot acknowledged that it was a violation of the Associations' rules for Bankard to process VII transactions without

signing the VII TMA.  Talbot also opined that Conway was an agent for plaintiffs, not defendants, because defendants were not allowed to use an unregistered agent.  He testified that there was no evidence that Grupo Mercarse was acting as an unregistered ISO.

Talbot also testified that it was not a violation of the Associations' rules for Bankard to send VII's payments to MerCarSe.  A merchant can designate a third party account where the member can route payment, as long as that third party is not the bank's agent.  Thus, it would have been compliant with the rules for VMS or VII to designate payments to go to MerCarSe, provided that MerCarSe was not Bankard's agent.  He believed that Bankard performed the essence of the VII TMA; thus the fact that it was never signed did not cause any losses to plaintiffs.

Talbot agreed with Musante that it was uncommon for the Associations to suspend a bank's license to process credit card transactions.  In his opinion, the suspension was a "massive overreaction by Mastercard," and that Mastercard and Visa "got cold feet on this business."

## VI.  *Verdict*

On January 27, 2016, the jury reached a verdict in favor of VMS and VII on all claims (unanimously  other than a vote of 11-1 on VII's conversion claim), awarding $1,526,168.96 in compensatory damages to VMS and zero damages to VII.  Regarding punitive damages, the jury found that plaintiffs demonstrated by clear and convincing evidence that defendants engaged in the conduct with malice, oppression, or fraud.  Following a brief punitive damages trial, the jury awarded punitive damages of $7.5 million against defendants, jointly and severally.

## VII.  *Post-trial Proceedings*

During trial, defendants filed a motion for nonsuit on the FAC, again raising arguments regarding VMS's standing and the statute of limitations, among others.  The parties filed further briefing on the nonsuit motion following the jury's verdict.  Ultimately, defendants withdrew the motion for nonsuit.

The court entered judgment on March 11, 2016.  Defendants subsequently moved for a new trial and for judgment notwithstanding the verdict.

The court heard argument on defendants' motions and then took the matter under submission. The court issued its ruling on May 13, 2016, granting defendants' motion for JNOV as to punitive damages and otherwise denying the motions. As relevant here, the court rejected defendants' challenges regarding the statutes of limitations, VMS's standing, and the jury's findings of agency and causation. However, the court agreed with defendants that there was insufficient evidence to support a punitive damages award. We discuss the relevant details of the ruling further below.

The court also denied defendants' motion for a new trial, finding sufficient evidence to support the verdict, other than as to punitive damages. The court rejected defendants' argument that plaintiffs' counsel engaged in misconduct during closing argument, finding defendants forfeited the argument by failing to object at trial and also failed to establish prejudicial misconduct. The court also found defendants failed to establish that evidence was improperly introduced at trial, noting that defendants did not cite any specific evidence admitted contrary to a ruling on a motion in limine.

The court entered amended judgment on June 28, 2016. The court subsequently granted plaintiffs' motion for cost of proof sanctions pursuant to section 2033.420, subdivision (b) (section 2033.420(b)), finding that two of defendants' denials to plaintiffs' requests for admissions lacked a reasonable basis. The court awarded plaintiffs $80,658.75 in sanctions. We discuss the details of these rulings in the related Discussion section below.

The parties timely appealed.

## DISCUSSION

### I. *Statutes of Limitations*

Defendants asserted below that this action is time-barred, but the court found that the applicable statutes of limitations were equitably tolled while Conway represented that she was attempting to recover funds from defendants. In a two-part argument, defendants contend that the court erred. First, they assert that the relevant doctrine is equitable estoppel, rather than equitable tolling. Second, they argue that equitable estoppel does not apply, because plaintiffs did not properly raise it and the evidence does not support its application. We agree that the applicable doctrine is

equitable estoppel, rather than equitable tolling.  However, we find no error in the court's determination that plaintiffs' claims are timely.

A.    *Scope of Review*

In their opening brief, defendants' entire argument regarding the statute of limitations is limited to three paragraphs.  Defendants argue that plaintiffs "waived" equitable tolling as a defense, because plaintiffs conceded that there was no basis for delayed discovery and "there is *no distinction* between equitable tolling and delayed discovery in this case."  Defendants also contend that equitable estoppel, rather than equitable tolling, is the applicable doctrine here, but that plaintiffs did not properly raise it below.  Moreover, they assert that "the undisputed facts make clear that equitable estoppel does not apply," because plaintiffs "understood that legal action was necessary to recover the funds as early as December 2007."

In their reply brief, defendants devote approximately 15 pages to the statute of limitations, including different and significantly more detailed arguments regarding the applicability of the statutes of limitations.  For example, they describe at length the circumstances under which equitable tolling is applicable, citing new authority, and arguing that the doctrine is inapplicable here because defendants did not have notice of the theory.  Defendants also assert that the court "had no authority to toll the limitations period under equitable estoppel."  Finally, defendants spend almost five pages arguing that equitable estoppel does not apply to this action, again citing new authority and fleshing out the elements of their claim.

It is well established that the purpose of a reply brief is to address arguments made in the respondent's brief; it may not be used to raise new arguments or present new authorities.  "Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant. [Citations.]"  (*Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11.)  "'[T]he rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.'"  (*People v. Smithey* (1999) 20 Cal.4th 936, 1017, fn. 26.)  No good reason was shown here; instead, plaintiffs and the court had no

opportunity to respond to these arguments.[13] Thus, we address the arguments made in defendants' reply brief only to the extent that they were adequately raised in the opening brief or made in response to arguments presented in plaintiffs' response brief. We take the same approach with respect to the other issues as well, including defendants' arguments regarding sufficiency of the evidence, which span only seven pages in the opening brief but 55 pages in reply. Tellingly, defendants' reply brief is twice as long as their opening brief, which includes the statement of facts.

  B. *Legal Standards*

  The longest limitations period available to plaintiffs is four years for the breach of contract claim. (§ 337, subd. (a).) The complaint was filed in August 2011. Thus, if plaintiffs' claims accrued prior to August 2007, they are time-barred unless an exception applies. "The statute of limitations usually commences when a cause of action 'accrues,' and it is generally said that 'an action accrues on the date of injury.' Alternatively, it is often stated that the statute commences 'upon the occurrence of the last element essential to the cause of action.'" (*Bernson v. Browning–Ferris Industries* (1994) 7 Cal.4th 926, 931.)

  Over the course of the case, the parties have argued regarding the applicability of three exceptions to the statute of limitations bar: delayed discovery, equitable tolling, and equitable estoppel. Under the discovery rule, "'the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her.'" (*Bernson v. Browning–Ferris Industries, supra,* 7 Cal.4th at p. 932; see also *Vaca v. Wachovia Mortgage Corp.* (2011) 198 Cal.App.4th 737, 743.)

  Similarly, equitable tolling operates "to suspend or extend a statute of limitations as necessary to ensure fundamental practicality and fairness." (*Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 370 (*Lantzy*).) Equitable tolling has been applied to suspend the statute of limitations in a select set of circumstances, including where a plaintiff "has several legal remedies and,

---

  [13]We also note that both parties' failure to accurately present the facts (whether disputed or undisputed) unnecessarily complicated our review of this case.

reasonably and in good faith, pursues one," but it then becomes necessary to pursue a second remedy. (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 100; see also *Elkins v. Derby* (1974) 12 Cal.3d 410, 412-413.) In addition, the statute may be tolled where a defendant has fraudulently concealed a cause of action. (See *Regents of Univ. of Calif. v. Sup.Ct. (Molloy)* (1999) 20 Cal.4th 509, 533.)

On the other hand, equitable estoppel applied against a limitations defense "usually 'arises as a result of some conduct by the defendant, relied on by the plaintiff, which induces the belated filing of the action.'" (*Spray, Gould & Bowers v. Associated Internat. Ins. Co.* (1999) 71 Cal.App.4th 1260, 1267–1268, quoting *Prudential–LMI Com. Insurance v. Superior Court* (1990) 51 Cal.3d 674, 689–690.) ""Four elements must ordinarily be proved to establish an equitable estoppel: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and, (4) he must rely upon the conduct to his injury."" (*Ashou v. Liberty Mutual Fire Ins. Co.* (2006) 138 Cal.App.4th 748, 766–767.)

For estoppel to apply, "[i]t is not necessary that the defendant acted in bad faith or intended to mislead the plaintiff. [Citations.] It is sufficient that the defendant's conduct in fact induced the plaintiff to refrain from instituting legal proceedings." (*Shaffer v. Debbas* (1993) 17 Cal.App.4th 33, 43.) However, "[r]eliance by the party asserting the estoppel on the conduct of the party to be estopped must have been reasonable under the circumstances." (*Mills v. Forestex Co.* (2003) 108 Cal.App.4th 625, 655.) "The defendant's statement or conduct must amount to a misrepresentation bearing on the *necessity* of bringing a timely suit; the defendant's mere denial of *legal liability* does not set up an estoppel." (*Vu v. Prudential Property & Casualty Ins. Co.* (2001) 26 Cal.4th 1142, 1149–1153.)

"Equitable tolling and equitable estoppel are distinct doctrines. 'Tolling, strictly speaking, is concerned with the point at which the limitations period begins to run and with the circumstances in which the running of the limitations period may be suspended. . . . Equitable estoppel, however, . . . addresses . . . the circumstances in which a party will be

estopped from asserting the statute of limitations as a defense to an admittedly untimely action because his conduct has induced another into forbearing suit within the applicable limitations period.  [Equitable estoppel] is wholly independent of the limitations period itself and takes its life . . . from the equitable principle that no man [may] profit from his own wrongdoing in a court of justice.'" (*Lantzy, supra*, 31 Cal. 4th at pp. 373-374.)

We review the trial court's factual determinations for substantial evidence.  (See *Hopkins v. Kedzierski* (2014) 225 Cal.App.4th 736, 756 (*Hopkins*) ["'The determination of whether a defendant's conduct is sufficient to invoke [equitable estoppel] is a factual question entrusted to the trial court's discretion.'"].)  To the extent defendants argue that the trial court's factual findings were not legally sufficient to support the application of equitable estoppel, that presents a question of law that we review de novo. (See, e.g., *id*. at p. 748; *R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 188.)  As discussed further in Section III.B., post, these same standards apply to our review of the trial court's factual and legal determinations in its ruling on the motion for JNOV, with the trial court acting as the trier of fact.  (See *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th1107. 1138 (*Wolf*); *Hopkins, supra,* 225 Cal.App.4th at p. 745.)

C.    *Background*

Because the processing relationship between plaintiffs and defendants ended in 2006, but plaintiffs did not file their lawsuit until 2011, the issue of a statute of limitations bar has been present from the beginning of the case. In both the complaint and the FAC, plaintiffs alleged that defendants "intentionally misled" them and made false representations and assurances of payment, causing plaintiffs "to retain counsel in order to informally procure Defendants' compliance with its obligations and secure payment of sums owed," and that they made these efforts "well into 2009."  Plaintiffs further alleged that defendants and their agents "intended Plaintiffs to rely upon their statements and defer commencing legal action against them," and that if plaintiffs had known the truth about Conway and their money, they would have filed suit "much earlier."

Defendants moved for summary judgment, arguing in part that the statutes of limitations barred plaintiffs' claims.  In opposition, plaintiffs

28

argued that both equitable estoppel and equitable tolling applied, because defendants fraudulently concealed their causes of action and defendants and their agents made misstatements, so plaintiffs were "fraudulently induced to defer acting" on the missing funds. The court found plaintiffs presented sufficient evidence of fraudulent concealment to defeat summary judgment.

Defendants again raised the statute of limitations in their motion for JNOV, and the parties and court continued to discuss equitable estoppel and equitable tolling somewhat interchangeably. For example, in their opposition, plaintiffs argued that their claims were not barred because of defendants' fraudulent concealment, and therefore that the statutes of limitations should be equitably tolled. However, plaintiffs also contended that Conway "lulled Plaintiffs into inactivity by misrepresenting that her personal contacts at Bankard and Rizal would obtain VMS's money" without litigation, categorized this conduct as "equitable tolling by estoppel," and cited to cases relying on both doctrines. (See *Gaglione v. Coolidge* (1955) 134 Cal.App.2d 518, 527 [finding estoppel where appellant relied on continuing promise of repayment by respondent]; *Cross v. Bonded Adjustment* (1996) 48 Cal.App.4th 266, 281 [tolling].)

During the hearing, defense counsel acknowledged her understanding of plaintiffs' argument that Conway led plaintiffs to believe litigation was unnecessary, but suggested that argument was based on equitable tolling.[14] Plaintiffs' counsel stated he agreed with the court that the applicable doctrine was equitable tolling, rather than delayed discovery, but pointed to evidence that plaintiffs waited to sue in reliance on Conway's statements that she could procure an informal resolution of their claims through her contacts with Baker McKenzie and the Yuchengco family.

In its ruling on the motion for JNOV, the court rejected plaintiffs' argument that defendants waived the defense by failing to submit the issue to the jury. The court found that defendants had raised the statute of limitations defense "at all relevant stages in the lawsuit," both parties sought

---

[14]Defendants did not argue below, as they have here, that equitable estoppel was the applicable doctrine as distinct from equitable tolling, nor did the trial court or plaintiffs make that distinction.

to have the affirmative defenses tried to the court, and further, the substantive issue of equitable tolling was not an issue for the jury.

Noting that plaintiffs argued both delayed discovery and "equitable tolling by estoppel," the court rejected the former theory, "as plaintiffs learned of the actual damages at issue in this case more than four years before the complaint was filed." However, citing *Lantzy v. Centex Homes*, *supra*, 31 Cal.4th at p. 370, the court concluded that "the statute of limitations was equitably tolled during the time that Janet Conway represented that she could recover the funds from defendants, as an alternative to filing a lawsuit." The court found the testimony of plaintiffs' witnesses credible that "through 2010, they relied on Janet Conway as an ostensible agent of the defendants to recover Verotel's money" and that such reliance was reasonable.

The court also noted that even if equitable tolling ended in December 2007, when Conway stated she no longer had contacts at Bankard, the complaint filed in August 2011 was timely. However, the court found that Conway continued to induce plaintiffs to rely on her to seek recovery of their money through her connections to defendants' owners until 2010. As such, "the Court is persuaded to apply equitable estoppel particularly due to the credible testimony from VMS that indicated it was not sleeping on its rights but was actively attempting to recover the funds."

The court rejected defendants' argument that plaintiffs were required to plead equitable estoppel in the complaint, noting that because the issue was being adjudicated by the court after trial, the court could order the complaint amended to conform to the proof at trial. Further, the court found defendants had adequate notice "about the facts underlying [the] equitable estoppel argument during this litigation" and there was no unfair prejudice to defendants from a ruling "based on the facts developed at trial."

D.    *Analysis*

As an initial matter, we reject plaintiffs' contention that defendants forfeited their statute of limitations defense by failing to submit the issue to the jury. We agree with the trial court's findings that both parties agreed to have the affirmative defenses tried to the court and plaintiffs are not entitled to a jury trial on the issue. (See *C & K Engineering Contractors v. Amber*

*Steel Co.* (1978) 23 Cal.3d 1, 9 [where an "action is essentially one in equity and the relief sought 'depends upon the application of equitable doctrines,' the parties are not entitled to a jury trial."]; *Hopkins, supra,* 225 Cal.App.4th at p. 745 [finding no right to jury trial on claims of equitable estoppel or equitable tolling].)

Turning to defendants' contentions, they first assert that the court improperly applied equitable tolling to relieve plaintiffs from the bar of the statutes of limitations. Instead, defendants argue that equitable estoppel is applicable to plaintiffs' claim that they were induced to pursue retrieval of their money through informal means, rather than immediately through litigation.

We agree that plaintiffs' claim is properly analyzed as one for equitable estoppel, rather than equitable tolling. Plaintiffs acknowledge that they knew in late 2006 or early 2007 that they were missing money from their transactions with defendants, but delayed filing their lawsuit based on assurances from Conway that she could secure their funds through her relationship with defendants, and later, with defendants' owners. Thus, at its core, plaintiffs' claim is one of fraudulent *inducement* to delay litigation, rather than *concealment* of that claim. As such, it is properly considered as a claim that the conduct by defendants and their agents should estop defendants from asserting a statute of limitations defense.

Next, defendants argue that plaintiffs cannot assert equitable estoppel because they did not plead it in the FAC, did not assert it in opposition to the motion for JNOV, and the court did not rely on it. We are not persuaded that plaintiffs' failure to clearly label their claim as equitable estoppel is fatal here. The timeliness of plaintiffs' claims was fully litigated below. Both parties and the court used the terms estoppel and tolling either in combination or interchangeably throughout the case, and defendants never objected or sought clarification. More importantly, plaintiffs consistently presented facts—first alleged in the complaint and then as evidence at trial—supportive of an estoppel defense. We reject defendants' contention that plaintiffs were required to specifically identify their claim as estoppel in their complaint, where plaintiffs alleged facts of fraudulent inducement that would

establish the defense, and then introduced evidence supporting those allegations at trial.

Defendants' citation to *Lantzy, supra*, 31 Cal.4th at pp. 384-385, does not suggest otherwise, as that case involved an appeal from a demurrer, rather than a post-trial motion for JNOV. Moreover, the court in *Lantzy* examined the *facts* alleged in the complaint, and concluded that the complaint was "devoid of any indication that defendants' conduct actually and reasonably induced plaintiffs to forbear suing." (*Id.* at p. 385.) *Lantzy*, therefore, does not support defendants' contention that plaintiffs' FAC was deficient. Further, defendants have not shown that application of estoppel to this case is erroneous or prejudicial to them, where plaintiffs have consistently argued that they were fraudulently induced (supporting a finding of estoppel) and defendants had multiple opportunities to respond to those arguments.

Defendants also contend there is insufficient evidence to support a finding of equitable estoppel, because Conway "did not 'promise' to recover the money without the necessity of filing suit" and plaintiffs were unreasonable in waiting to file suit until 2011. Instead, defendants contend it is "undisputed that plaintiffs understood that legal action was necessary" to recover their money as of December 2007. We conclude that substantial evidence supports the trial court's conclusion. Both representatives from VMS testified that between 2006 and 2010, they trusted Conway as a representative of the bank and relied on her representations that she was working first with Bankard and then with the Yuchengco family to retrieve the missing funds. The trial court found this testimony credible and concluded that VMS "was not sleeping on its rights but was actively attempting to recover the funds." We will not reweigh the evidence or disturb these credibility findings on appeal.[15]

---

[15]During oral argument, defendants' counsel also argued that other elements of an equitable estoppel claim were neither established by plaintiffs nor found by the trial court, particularly the requirement of notice to defendants. Defendants did not raise the issue of notice until their reply on appeal. Moreover, even in reply, they argued that the lack of notice meant a failure to meet the elements of equitable *tolling,* but made no similar claim

## II.    *VMS's Standing*

Next, defendants challenge VMS's standing to bring both its contract and tort claims.  We affirm the trial court's denial of JNOV on this issue.

### A.    *Background*

Defendants unsuccessfully raised the issue of VMS's standing in a motion for summary judgment, a motion for nonsuit, and the motion for JNOV.  In their motion for JNOV, defendants argued that VMS had no standing to pursue contract claims because it was not a party to the VII TMA, "upon which all of plaintiffs' claims are based." Defendants additionally argued that plaintiffs' tort claims arose out of the same contractual relationship, and therefore failed for the same reason.

At the post-trial hearing, plaintiffs argued that the applicable contract was composed of the totality of defendants' "agreement to pay" VMS, because it was VMS's money and VMS whose "rights were affected," pursuant to the transactions VMS submitted "and in accordance with the Association rules." Plaintiffs also pointed to the account boarding requests that the parties used to facilitate processing prior to the VII TMA and argued there was an "implied" contract between VMS and defendants.

The court concluded that VMS had standing to bring its contract and tort claims, although it was not a signatory to the VII TMA. The court reasoned that by awarding the full amount of actual damages to VMS, and nothing to VII, the jury implicitly found that "VMS was the party actually due the funds, and . . .VII was merely a conduit established for VMS to contract in the Philippines."  Further, the court concluded that "VMS and defendants entered into a business relationship" in 2004 for "processing a significant volume of credit card transactions," based on the evidence that transaction processing occurred and defendants paid. Accordingly, "[w]hatever instrument governed this relationship –and whatever the details of the contract at any given time – the relationship that began in 2004 was a contractual one for purposes of standing."

In addition, the court found that this contractual relationship between VMS and defendants was not replaced by the VII TMA, noting that

with respect to equitable *estoppel*.  As such, defendants have forfeited this claim.

defendants did not sign the agreement and that one version "appears to have been void as a matter of law" because it contained a forged signature of plaintiffs' principal. The court also noted that the contractual relationship continued after the introduction of the VII TMA and that the "jury may reasonably have relied on the instruction that the contract could be oral, or part oral and part written, in awarding VMS the funds."

Moreover, even if VMS lacked standing to bring a contract claim on the VII TMA, the court found that VMS had standing to bring its tort claims. The court found that VMS was directly harmed by defendants' actions and that VMS and VII "had no functionally separate existence." Thus, the court inferred "that the jury was applying the equivalent of an alter ego theory."

B.  *Standard of review*

Standing is a question of law we review de novo. (*San Luis Rey Racing, Inc. v. California Horse Racing Bd.* (2017) 15 Cal.App.5th 67, 73; *Fry v. City of Los Angeles* (2016) 245 Cal.App.4th 539, 548-549.) However, we defer to the trial court's underlying factual findings relevant to the question of standing, and review those findings for substantial evidence. (*Fry v. City of Los Angeles*, *supra*, 245 Cal.App.4th at p. 549.) As discussed further in Section III.B., post, these same standards apply to our review of the trial court's factual and legal determinations in its ruling on the motion for JNOV. (See *Wolf, supra,* 162 Cal.App.4th at p. 1138.)

C.  *Analysis*

"In general terms, in order to have standing, the plaintiff must be able to allege injury—that is, some 'invasion of the plaintiff's legally protected interests.'" (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 175, quoting 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 862, p. 320; see § 367 ["Every action must be prosecuted in the name of the real party in interest, except as otherwise provided by statute"].) "It is elementary that a party asserting a claim must have standing to do so. In asserting a claim based upon a contract, this generally requires the party to be a signatory to the contract, or to be an intended third party beneficiary." (*Berclain America Latina v. Baan Co.* (1999) 74 Cal.App.4th 401, 405.)

Plaintiffs have not claimed to be third party beneficiaries to any contract at issue here. Thus, to have standing to assert their breach of

contract claim, plaintiffs must establish their right to recover as a party to an applicable contract. (See *Roth v. Malson* (1998) 67 Cal.App.4th 552, 557 ["It is, of course, basic hornbook law that the existence of a contract is a necessary element to an action based on contract."]; *Hale v. Sharp Healthcare* (2010) 183 Cal.App.4th 1373, 1387 ["A cause of action for breach of contract requires pleading of a contract, plaintiff's performance or excuse for failure to perform, defendant's breach and damage to plaintiff resulting therefrom."].)[16]

Defendants argue that the jury's verdict must be based on the VII TMA because "at all times *through trial*, plaintiffs claimed that its [sic] loss was caused by Bankard's violation" of that contract. Thus, because VMS was not a signatory to the VII TMA, defendants contend VMS cannot bring a claim for its breach. Defendants further argue, without support, that VMS cannot show it has standing under the VII TMA "because it conceded [after trial] that this contract was irrelevant and did not cause its loss and waived its claim that it had any interest in this contract."

As a preliminary matter, we disagree with the factual premise of defendants' argument that plaintiffs first claimed the VII TMA was the *only* basis for their injuries, and then reversed course post-trial to contend that the VII TMA was irrelevant. VMS argued throughout the case that its contract claim was not based on the VII TMA alone, citing their prior processing relationship with Bankard, defendants' refusal to sign the agreement, and defendants' subsequent willingness to continue processing without the signed VII TMA. At the same time, plaintiffs relied on parts of the VII TMA, most notably the payment instructions directing payment to VMS's bank account, as evidence of terms to which the parties had agreed, but with which defendants failed to comply.

---

[16]We reject defendants' assertion that VMS "falsely" referred to itself as "Verotel" in its appellate briefs in order to "blur the distinction" between VMS and VII and "put itself in VII's position as it relates to the TMA-VII Contract." Although defendants suggest that there was no dispute at trial that the term "Verotel" referred exclusively to VII, in fact, plaintiffs and their counsel referred to both VMS and VII at times as "Verotel." In any event, we analyze the standing issue with respect to entities VMS and VII.

Plaintiffs' contractual theory, while hardly a model of clarity, was never as blatantly contradictory as defendants contend.[17]  Defendants' contention that plaintiffs never argued that VII itself was a "sham" until after trial is similarly unsupported.  While plaintiffs never used that term, they presented substantial evidence and argument suggesting that VII never operated as a separate company apart from VMS, including testimony that it never had any offices or employees, and that the transactions and corresponding payments therefore belonged to VMS.

Further, we find substantial evidence supports the jury's verdict and the trial court's conclusion that the jury found a contractual relationship between VMS and defendants that began well before the VII TMA and continued until the end of the processing relationship.  The jury was instructed that contracts may be written, oral, or partly written and partly oral.  Plaintiffs introduced evidence that VMS discussed terms with Conway, as an agent for the bank, including the amount of transaction fees the bank would charge; CNP would act as the processor or administrator between Bankard as the bank and VMS as the merchant; and VMS would receive payment into its bank account at Rabo Bank.  Zuurbier also testified that VMS found this proposal "acceptable" and began processing under these terms in mid-2005.

In addition, Kraajivanger testified that under the "earlier agreement" with Bankard and CNP, VMS received MID numbers from Bankard to begin processing with the "lower rates" in 2005, as promised by Conway.  The jury could have found these terms constituted an oral or oral/written contract between VMS and Bankard, supported by the evidence that Bankard processed VMS's transactions, charged the agreed-upon transaction fees, and paid VMS by depositing funds into its bank account.  Defendants' citation to

---

[17]Defendants' repeated suggestion that the court made a "post-verdict ruling" that the VII TMA was "void as a matter of law," is imprecise, if not misleading.  In ruling on the motion for JNOV, the court stated that the *version* of the VII TMA possessed by defendants, and under which they claimed to be processing transactions for VII, "appears to have been void" because it contained forged signatures, and therefore plaintiffs could not be bound by that version.

evidence supporting a contrary inference is insufficient to meet their burden on appeal.

In their responding brief, defendants argue that, at most, the evidence of the parties' conduct cited by plaintiffs and the court could support an implied contract, but the jury was not instructed regarding implied contracts and therefore could not have found a breach of contract on that basis. We need not reach this contention, as we conclude the evidence was sufficient to support a finding of an express contract.

Defendants also contend that VMS lacks standing to assert its tort claims because those claims arose out of the contract, and therefore fail along with the contract claims. Because we conclude that VMS established standing for its contract claims, our conclusion applies to the tort claims as well. Defendants' contention that VMS and Bankard "were strangers" and Bankard therefore owed VMS no legal duty was clearly rejected by the jury. We will not reweigh that evidence on appeal.

## III. *Sufficiency of the Evidence*

Defendants challenge the sufficiency of the evidence to support two aspects of the jury's verdict: (1) that Conway was defendants' agent and was acting within the scope of that agency; and (2) that defendants' conduct caused plaintiffs' damages. We conclude that substantial evidence supports the verdict.

### A. *Background*

In their motion for JNOV, defendants argued that there was no evidence that Conway was defendants' agent or was acting within the scope of any such agency in taking money from plaintiffs. The court found sufficient evidence that Conway acted as defendants' agent in dealing with VMS. The court explained that defendants "entered into a venture with Conway in which she would renegotiate or re-fashion their agreements with VMS and defendants' other customers." The court noted that the evidence showed Conway was empowered to negotiate for defendants, as she successfully secured lower transaction fees charged by the bank to plaintiffs. Thus, "defendants' apparent agreement with Conway that she could represent them in their dealings with customers is sufficient intentional conduct to create the impression of agency, if not an actual agency

relationship."  The court also pointed to the TMAs, which listed Bankard as the "Member" and "a Conway company" as the "Agent," and stated that the agent would perform services on behalf of the member.  The court noted that defendants' allegations of agency in their original cross-complaint further supported the jury's verdict.

Defendants also raised a cursory challenge based on causation in their motions for JNOV and new trial, arguing in a single paragraph that "plaintiffs suffered no harm as a result of any transaction processed under" the VII TMA and further, that plaintiffs' loss "arose from TicketsClub transactions processed under the TMA-Grupo Mercarse contract."  The court did not specifically address this argument in its ruling, but found that "there was sufficient evidence to support the verdict."

B.     *Standard of Review*

When reviewing an order granting or denying JNOV, an appellate court will use the same standard the trial court used in ruling on the motion, by determining whether it appears from the record, viewed most favorably to the party securing the verdict, that any substantial evidence supports the verdict.  If there is any substantial evidence, contradicted or uncontradicted, or reasonable inferences to be drawn therefrom in support of the verdict, the motion should be denied.  (See *Wright v. City of Los Angeles* (1990) 219 Cal.App.3d 318, 343; *Wolf, supra,* 162 Cal.App.4th at p. 1138.)  "'The purpose of a motion for judgment notwithstanding the verdict is not to afford a review of the jury's deliberation but to prevent a miscarriage of justice in those cases where the verdict rendered is without foundation.'"  (*Sukoff v. Lemkin* (1988) 202 Cal.App.3d 740, 743.) The "focus is on the quality, not the quantity of the evidence." (*Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 871.) We resolve all evidentiary conflicts and indulge all reasonable inferences in support of the judgment.  (*Leung v. Verdugo Hills Hospital* (2012) 55 Cal.4th 291, 308.)  If the appellant raises purely legal questions, we conduct a de novo review.  (*Hirst v. City of Oceanside* (2015) 236 Cal.App.4th 774, 782; *Wolf, supra,* 162 Cal.App.4th at p. 1138.)

C.    *Agency*

The trial court found sufficient evidence that Conway was operating as defendants' agent (either actual or ostensible) to support the jury verdict.  We agree.

"It is settled that a principal is liable for compensatory damages for the wrong committed by an agent in transacting the principal's business regardless of whether the wrong is authorized or ratified by the principal, and this rule applies even where the wrong is intentional and malicious." (*Hudson v. Nixon* (1962) 57 Cal.2d 482, 484, citing Civ. Code, § 2338.)  "Proof of an agency relationship may be established by 'evidence of the acts of the parties and their oral and written communications.'" (*Van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 573.)

Plaintiffs introduced evidence at trial that Conway solicited their business in 2005, purportedly as an agent of the bank.  As evidence of her relationship with Bankard, Conway showed plaintiffs marketing materials from the bank and offered to lower the rate of transaction fees charged by the bank.  Both Kraajivanger and Zuurbier testified that they believed Conway was working on behalf of the bank because in mid-2005, VMS began to be charged at the rate of 4.5 percent and $0.20 (reduced from 5.65 percent and $0.45), as Conway promised.  In addition, Broadner and Conway supplied VMS with MIDs, which the bank issued to its merchants to allow them to submit transactions.  Once plaintiffs began processing, they received authorization codes indicating that the transactions were approved by the Associations.

There was also evidence that Conway owned or controlled both Grupo Mercarse and its affiliate, MerCarSe, as well as MRRI. Conway's control of MerCarSe and MRRI was undisputed.  Further, the investigative report produced by MRRI regarding MerCarSe lists Conway as both the president of MerCarSe and a principal of Grupo Mercarse.[18]  In addition, defendants

---

[18]Defendants argue that this finding would be "contrary" to the court's 2013 ruling quashing service of process on Conway for the cross-complaint. Defendants contend that ruling "expressly found that Conway did *not* own or control Grupo Mercarse.  We do not find this contention persuasive.  That ruling was made based on Rizal's failure to present evidence in 2013 to

alleged in their amended cross-complaint that Conway was a "shareholder, director, and/or officer" of MerCarSe, MRRI, and Grupo Mercarse.[19]  This evidence supported the conclusion that Conway, through Grupo Mercarse and/or MerCarSe, was acting as Bankard's agent in dealing with plaintiffs.

The jury's agency finding was further supported by the fact that Grupo Mercarse was identified as the bank's agent on both versions of the VII TMA.  Although the bank claimed Grupo Mercarse's identification as its agent was a "clerical error," that claim is undercut by the fact that the agreement was signed by Michael Conway on behalf of Grupo Mercarse, and the bank's admission at trial that it processed VII transactions under this agreement.  In addition, the payment provision of the VII TMA lists MerCarSe's name in each place where the template and the Grupo TMA referred to the bank's agent.

We also note that defendants admitted agreeing to operate their card-not-present processing business under the "self-sustaining business model" run by Conway, Michael, and Ung, through CNP and the "Mercarse Group of Companies" (including Grupo Mercarse, MerCarSe, and MMRI).  Defendants alleged the operation of this business plan in their amended cross-complaint and Reyes confirmed the arrangement at trial.  This evidence further supports a finding that Conway was acting as Bankard's agent when engaged in the conduct plaintiffs alleged here.

Defendants' attempts to undercut the evidence of agency do not alter our conclusion.  First, defendants challenge the court's reliance on Conway's ability to reduce the transaction fee rate by arguing that it is "uncontroverted that the rate charged by Bankard for the two years never changed and it was

_____

establish a basis for jurisdiction over Conway in California, after the court specifically noted that Rizal had failed to conduct any jurisdictional discovery.

[19]The parties argue at length about the import of citations to the original cross-complaint by plaintiffs and the court.  We note that the court stated it was not relying on the allegations in the cross-complaint as judicial admissions, but citing them as further support for the jury's verdict.  Moreover, contrary to defendants' contention that the cited paragraphs "were all amended," most of the relevant allegations remained in the amended cross-complaint.

significantly lower than the rate charged by Conway." This appears to be a reference to the rate of 3.35 percent and $0.10 that Bankard charged Grupo Mercarse as a merchant under the Grupo TMA. In other words, defendants claim that all of plaintiffs' transactions prior to the VII TMA were processed under the Grupo TMA (a claim plaintiffs dispute); therefore, any reduction in the rate charged to VMS did not affect the contract rate charged by Bankard and was done by Conway "on behalf of Grupo Mercarse," without any knowledge or approval by the bank. Defendants further argue that "by its own admission, VMS was aggregating which means that it had no processing relationship with Bankard and was processing through Grupo Mercarse," and thus any actions by Conway were done to benefit Grupo Mercarse, rather than the bank.

We are not persuaded that this is the only reasonable inference the jury could draw from the evidence. Plaintiffs' witnesses at trial denied processing their transactions under Grupo Mercarse's contract or MID numbers. In addition, plaintiffs testified that VMS began processing with Bankard under Broadner in 2004, *before* the Grupo TMA was signed in early 2005. Similarly, plaintiffs presented evidence that the rates, process, and payments for their transactions with Bankard did not change after signing the VII TMA, under which the bank was admittedly dealing with VII as the merchant.

Indeed, the rate Bankard charged Grupo Mercarse under the Grupo TMA (3.35 percent and $0.10) was *lower* than both the initial rate VMS paid through Broadner in 2004 (5.65 percent and $0.45) and the reduced rate VMS paid once it began processing with Conway in 2005 (4.5 percent and $0.20). Thus, defendants' claim that VMS was processing under the Grupo TMA requires an assumption that both Broadner and Conway were inflating the rate charged to VMS (as a sub-merchant) above what Bankard was charging Grupo Mercarse (as the master merchant). Defendants never introduced any evidence to support this assumption; moreover, even if true, defendants offer no explanation how Conway's *reduction* of the inflated rate charged to VMS in 2005 was done to benefit Grupo Mercarse.

Further, although Kraaijvanger testified that VMS was "aggregating" in 2004, which he described as "processing transactions for other people that

41

you're not allowed to process for," he claimed it was in compliance with the Associations' rules "at the time," and did not further specify what he meant. Based on the rest of the testimony by Kraaijvanger and Zuurbier, the jury could have concluded that VMS was operating as the master merchant, aggregating transactions for other sub-merchants and sending them for processing under VMS's account, rather than the inference suggested by defendants, that VMS was operating as the sub-merchant under Grupo Mercarse.

Next, defendants argue that neither Conway nor any of her entities could have acted as the bank's agent because only CNP was authorized by the Associations to operate as an ISO for the bank. But there was evidence from which the jury could have found such agency, despite the lack of authorization. Indeed, defendants' witnesses acknowledged that CNP was initially only a merchant, but was actually functioning as the bank's agent, because Bankard was "confused about the terminology." Once the Associations issued a citation for noncompliance, Bankard applied to have CNP approved as an ISO. Thus, the jury could have concluded that defendants were able to use Conway and her entities as unauthorized agents, just as defendants had initially used CNP.

We also reject defendants' contention that there is insufficient evidence Conway was acting within the scope of any agency. In essence, defendants contend that any duties of Bankard's agent must be limited to services performed under the VII TMA. Therefore the scope of the agency would exclude any services to VMS, because it was not a party to the VII TMA. Because we have concluded that plaintiffs' claims are not limited to those arising solely under the VII TMA, we also reject these contentions.

Additionally, defendants contend Conway could not have been their agent because she was also defrauding Bankard. However, as their cited authority demonstrates, that defense requires a showing that the plaintiffs conspired with Conway, or, at a minimum, knew of the scheme to steal from Bankard. For example, in *Saks v. Charity Mission Baptist Church* (2001) 90 Cal.App.4th 1116, 1120, the plaintiff became involved in a real estate scheme with a developer and the former pastor and president of a church. The plaintiff sought to hold the church liable for two promissory notes signed by

the pastor in the name of the church, after the plaintiff paid to purchase property in furtherance of the scheme. (*Ibid.*) The uncontradicted evidence at trial established that the three individuals openly discussed their plan to use the church as a front to obtain a governmental loan with which to repay the plaintiff, and that the church was never intended to be an owner of the property. (*Id.* at pp. 1120, 1129-1130.) Accordingly, the court held that "where an officer of a corporation is openly using the corporation to obtain a benefit for himself and his cohorts in a transaction, in which the corporation will ultimately not benefit, the other parties to the transaction cannot later seek to hold the corporation liable for his actions." (*Id.* at pp. 1120, 1139-1140; see also Civ. Code, § 2306 ["An agent can never have authority, either actual or ostensible, to do an act which is, and is known or suspected by the person with whom he deals, to be a fraud upon the principal."]; *Meyer v. Glenmoor Homes, Inc.* (1966) 246 Cal.App.2d 242, 264 ["A corporation is not chargeable with the knowledge of an officer who collaborates with an outsider to defraud it"].)

Here, while defendants sought to convince the jury that plaintiffs were working with Conway to defraud Bankard by submitting unsanctioned transactions for processing, the jury rejected that theory. The fact that Conway's scheme may not have ultimately benefitted defendants (which plaintiffs also dispute) is insufficient to absolve defendants of liability.

D. *Causation*

Defendants also challenge the evidence supporting a finding that they caused VMS's losses. They offer two bases for this contention. First, they argue that the opinion offered by plaintiffs' expert, Musante, was based on the VII TMA, even though VMS conceded the VII TMA did not cause its loss. We have already rejected the argument that VMS made such a concession. Defendants also contend Musante's opinion was conclusory. "[W]hen an expert's opinion is purely conclusory because unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion, that opinion has no evidentiary value because an 'expert opinion is worth no more than the reasons upon which it rests.'" (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117, quoting *Kelley v.*

*Trunk* (1998) 66 Cal.App.4th 519, 523–525.) We find this argument unpersuasive.

Here, Musante testified at length about the problems he perceived with the VII TMA, including the designation of Grupo Mercarse as the bank's agent when it was not registered as an MSP; the designation of MerCarSe as the recipient for the merchant funds, rather than the bank paying plaintiffs directly; and the failure of the bank to sign the VII TMA, while continuing to process transactions without notifying plaintiffs of its concerns. He further opined that Bankard's lack of control over its own system and delegation of its own duties to third parties, such as Grupo Mercarse and MerCarSe, led to the losses by VMS, allowing Conway to steal funds from plaintiffs under the guise of agency from the bank. In addition, Musante testified that the bank acted improperly by retaining VMS's reserves after the relationship ended in 2006, and then transferring those funds to CNP, purportedly to pay taxes. These opinions had a sufficient factual basis to allow the jury to rely on them in support of its conclusion that defendants caused VMS's losses.

Second, defendants assert that there was "uncontradicted" evidence "that VMS's loss was caused by its aggregation, not by defendants," a contention we have already rejected. Defendants note that their expert, Talbot, opined that aggregation caused VMS's loss, and argue that we must treat that opinion as "binding in this appeal." They cite *Huber, Hunt & Nichols, Inc. v. Moore* (1977) 67 Cal.App.3d 278 (*Huber*), for the proposition that "when the matter in issue is within the knowledge of experts only and not within common knowledge, expert evidence is conclusive and cannot be disregarded." (*Id*. at p. 313 [regarding professional standard of care], citing *Engelking v. Carlson* (1939) 13 Cal.2d 216, 220-221 [same]; *Danielson v. Roche* (1952) 109 Cal.App.2d 832 [same].) This argument is frivolous. First, Talbot's opinion regarding the cause of VMS's loss, as well as the facts upon which it relied, were disputed by plaintiffs at trial. Indeed, Talbot himself also testified that he found VMS's accounting "impossible to reconcile" as to "which contracts, which agreements, which merchant I.D.'s, or which websites those numbers relate to." Thus, it was up to the jury to evaluate all of the evidence, including the testimony of both experts.

Second, *Huber* and the cases on which it relies concern expert testimony regarding the professional standard of care. (See *Huber, supra*, 67 Cal.App.3d at p. 313 ["Ordinarily, where a professional person is accused of negligence in failing to adhere to accepted standards within his profession the accepted standards must be established only by qualified expert testimony."].) These cases are inapplicable to Talbot's testimony regarding contracts and monetary losses. Indeed, defendants do not even attempt to explain how Talbot's opinions were limited to matters exclusively within the knowledge of experts. The jury was free to disbelieve him.

As such, defendants have not met their burden to establish that the court erred in concluding that substantial evidence supported the jury's verdict for plaintiffs.

## IV.  *Admission of Evidence*

Defendants challenge the trial court's admission of evidence regarding Bankard's suspension by the Associations and tax payments Bankard claims it paid to CNP on behalf of merchants other than plaintiffs. Defendants contend this evidence was irrelevant and unduly prejudicial to them. We find no abuse of discretion.

### A.  *Background*

Defendants filed numerous motions in limine prior to trial, including a motion seeking to exclude all evidence of Bankard's audit and subsequent suspension by the Associations. Defendants also sought to exclude all evidence related to the indemnification agreement between CNP and Bankard, and Bankard's payment under that agreement of any money from merchants other than plaintiffs. They argued that this evidence was irrelevant, would result in an undue consumption of time, and was highly prejudicial.

Prior to the first trial, the court denied defendants' motions in limine, finding they were improper dispositive motions. Defendants renewed their motions in advance of the second trial and the court heard extensive argument by the parties. Defendants argued that the suspension was irrelevant, as it was not based on issues related to plaintiffs' websites, the VII TMA, or any conduct similar to what plaintiffs alleged. Defense counsel acknowledged that Visa and MasterCard found violations related to the

45

TicketsClub websites, but argued that plaintiffs had no evidence that they owned TicketsClub, and also that the violations occurred because of misconduct by TicketsClub, rather than by defendants.

Plaintiffs argued that the suspension cited incidents of merchant agreement non-compliance, and that defendants' compliance with the Associations' rules about merchant agreements was "one of the critical issues in the case." As such, plaintiffs contended that "the suspension was predicated on the very wrongful conduct whether related specifically to [plaintiffs] or not that led to funds being wired to a third party rather than to the proper party," and the bank's "pattern of negligence," shown by its repeated rules violations, was the same conduct that ultimately led to plaintiffs' losses. The court denied the motion to exclude, reasoning that there seemed to be an issue of fact and it would be up to the jury to determine the weight of the evidence of rules violations relating to plaintiffs' allegations.

The court also found that evidence of whether Bankard paid taxes with the money it turned over to CNP was relevant and presented a factual dispute for trial. Defendants argued that the only relevant evidence related to approximately $23,000 paid on behalf of plaintiffs, not the entire $1.4 million Bankard sent to CNP from 79 merchant accounts. Plaintiffs argued that evidence of the entire amount Bankard paid was relevant to show that after its suspension, "the bank took 1.4 million dollars, paid it to the very entity [CNP] the bank is crediting with causing the termination. Told the merchants your money is gone because we paid taxes." The court indicated that it would allow evidence of the total amount paid and "general testimony about what is going on," but would not allow plaintiffs to go "item by item" through the details of payments related to other merchants, as that would be "far afield and a waste of time."

At trial, the parties introduced several exhibits related to the suspension, including the September 2006 letter informing defendants that MasterCard was suspending defendants' right to acquire card-not-present transactions. The letter cited 35 "incidents of compliance program violations," including violations of the Associations' rules regarding excessive chargebacks, merchant agreements (Rule 9.1.1), illegal or brand-damaging transactions, and fraud. Over defendants' objection, the court also admitted

46

a response letter from defendants to MasterCard, in which defendants acknowledged that they had "identified major issues in our internet merchant acquiring business that needs [sic] serious attention, thus drastic measures are being implemented to improve practices." In the letter, Bankard outlined the steps it was taking to address the issues, including requiring CNP "to do a reorganization of its management towards stricter risk monitoring and control."

In his testimony, plaintiffs' expert Musante opined that having 35 violations was "exceedingly excessive" and that the same conduct for which Bankard was cited led to VMS's losses. He also discussed at length the Associations' rules, including MasterCard rule 9.1.1, requiring a written merchant agreement before the member bank could begin processing transactions for a merchant, and the rule prohibiting the bank from allowing a third party to have access to merchant money or reserves. In explaining the bases for these rules, Musante testified that "because of Bankard's lack of control, they had merchants in this system that were engaged in child pornography and were engaged in other illicit activities like online pharmacy and sports betting." When plaintiffs' counsel asked a further question whether Musante had "seen indications that Bankard processed payments for companies engaged in child pornography," the court sustained defendants' objection.

Plaintiffs also introduced the indemnity agreement between Bankard and CNP, as well as evidence that Bankard was unhappy with CNP because of the suspension, terminated its sponsorship of CNP, and then sent more than a million dollars to CNP under the indemnity agreement. Bankard offered testimony by its executives that the amounts paid to CNP were "no longer merchant funds," but taxes paid to CNP as the collecting agent for the Philippine government.

B.    *Standard of review*

Under Evidence Code section 352, a trial court "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review the trial court's decision to admit or

exclude evidence for abuse of discretion and will not disturb that determination "'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 446-447, quoting *People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

C.   *Analysis*

1.   *Audit and suspension*

Defendants contend that the court erred in admitting evidence related to Bankard's audit and suspension by the Associations because this evidence "had no relevance to VMS's claim of loss." Apart from a citation to portions of its statement of facts, defendants offer no further argument regarding relevance in their opening brief and have therefore failed to establish error. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 408 ["To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error."]; *Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647 ["Where a point is merely asserted by appellant's counsel without any argument of or authority for the proposition, it is deemed to be without foundation and requires no discussion by the reviewing court."].)

Moreover, we find no support in the record for defendants' suggestion that the trial court based its decision to deny the motion in limine on a misrepresentation by plaintiffs as to the import of the evidence. The parties argued this issue at length prior to trial and submitted briefing, including the relevant exhibits. Defendants argued at the time that the incidents cited by the Associations as the basis for the suspension were not related to any transactions from plaintiffs. Plaintiffs responded that defendants' failure to adhere to the Associations' rules, particularly those regarding signed merchant agreements and payment directly to merchants, led to defendants' suspension and plaintiffs' losses. To the extent that defendants believed plaintiffs failed to prove a connection between the suspension and their damages, defendants were free to make that argument to the jury. We find no error in the trial court's conclusion that the issue was one of weight, rather than admissibility, and that plaintiffs had sufficiently shown that the suspension by the Associations was relevant to their claims.

Defendants also contend that any relevance of the evidence related to the suspension was outweighed by its prejudicial effect, because it allowed Musante to suggest that "Bankard promoted on-line child pornography and the illegal sale of pharmaceuticals and facilitated the flow of money to terrorist endeavors such as 9/11." Musante referred to these issues while explaining the importance of the Associations' rules, and the problem with banks, such as Bankard, failing to verify the websites of its merchants or ceding control of its processing to a third party. To the extent defendants objected to this evidence at trial and the trial court overruled the objections, we find defendants have failed to demonstrate any abuse of discretion. The references to these topics were limited and do not compel a conclusion that their prejudice to defendants substantially outweighed any probative value. (See Evid. Code § 352.) Indeed, defendants offered evidence that TicketsClub (and therefore potentially plaintiffs) was engaged in illegal sales of pharmaceuticals and had one of the highest percentages of fraud of any website.

### 2. *Tax payments*

Defendants also assert error regarding evidence related to the 2008 indemnity agreement between Bankard and CNP, and Bankard's payment to CNP under that agreement, purportedly to satisfy Philippine tax obligations of VII and 78 other merchants. Defendants contend that the trial court limited the admission of evidence on this issue to whether the $24,000 tax payment was made on behalf of VII, and "expressly prohibited any inquiry into tax payments on behalf of the *other* 78 merchants," but plaintiffs "violated" these limits at trial "with impunity" and the court "inexplicably refused to enforce its own ruling."

These contentions are not supported by the record. In ruling on defendants' motion in limine on this issue, the trial court noted that inquiry into the details of amounts purportedly paid by Bankard for taxes for merchants other than plaintiffs would be a "waste of time." However, the court agreed to allow evidence regarding the nature of the indemnity agreement reached between Bankard and CNP, and the total amount Bankard paid. At trial, plaintiffs introduced evidence consistent with these rulings. This included the indemnity agreement and the opinion of their

expert, Musante, that Bankard violated the Associations' rules by transferring merchant funds to CNP after CNP was deregistered, even though Bankard blamed CNP for the bank's termination by the Associations.

Contrary to defendants' assertions, plaintiffs did not present evidence or argument focused on "Bankard's tax payments for *other* merchants and the lack of *documents* to evidence these *other* payments." Rather, plaintiffs pointed to the total amount paid by Bankard to CNP, purportedly in satisfaction of tax obligations for all of the merchants, including plaintiffs. It argued that this was both an improper use of merchant funds and that there was no evidence the taxes were actually paid. For example, plaintiffs' counsel argued that "My client's money was eventually stolen. We were told that money was paid in taxes, and there is no proof anywhere." This was within the scope of the trial court's pretrial rulings.[20]

We also reject defendants' contention that evidence of the total amount of tax payments was more prejudicial than probative and confusing to the jury because it suggested that defendants "stole money from 79 merchants." Defendants made no showing of undue prejudice, and we find no abuse of discretion by the trial court in admitting this evidence. Further, because we conclude there was no error, we need not reach defendants' claim that any error was prejudicial.

## V.   *Cost of Proof Sanctions*

Defendants contend the trial court abused its discretion when it awarded $80,658.75 to plaintiffs as cost of proof sanctions pursuant to section 2033.420. They argue that the court erroneously concluded that plaintiffs had established all of the requisite factors with regard to Rizal's denial of two requests for admission. We are not persuaded.

### A.   *Legal Standards*

A party to a civil action may propound a written request that another party "admit . . . the truth of specified matters of fact, opinion relating to fact, or application of law to fact." (§ 2033.010.) Correspondingly, "[i]f a party fails to admit . . . the truth of any matter when requested to do so under

[20]Indeed, the trial court rejected this same argument in defendants' motion for new trial, as well as defendants' claim that plaintiffs' counsel committed misconduct during his closing argument.

[section 2033.010], and if the party requesting that admission thereafter proves . . . the truth of that matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees." (§ 2033.420, subd. (a).)  Once the party requesting the admission has made the showing under subdivision (a), the trial court is required to make such an order against the responding party, "unless [the court] finds any of the following:  [¶] (1) An objection to the request was sustained or a response to it was waived under Section 2033.290.  [¶] (2) The admission sought was of no substantial importance.  [¶] (3) The party failing to make the admission had reasonable ground to believe that that party would prevail on the matter.  [¶] (4) There was other good reason for the failure to admit." (§ 2033.420, subd. (b).)

"Requests for admissions differ fundamentally from other forms of discovery.  Rather than seeking to uncover information, they seek to eliminate the need for proof." (*Stull v. Sparrow* (2001) 92 Cal.App.4th 860, 864 (*Stull*).)  "The primary purpose of requests for admissions is to set at rest triable issues so that they will not have to be tried; they are aimed at expediting trial.  The basis for imposing sanctions [under section 2033.420 ] is directly related to that purpose.  Unlike other discovery sanctions, an award of expenses . . . is not a penalty.  Instead, it is designed to reimburse reasonable expenses incurred by a party in proving the truth of a requested admission . . . such that trial would have been expedited or shortened if the request had been admitted." (*Id*. at p. 865, quoting *Brooks v. American Broadcasting Co*. (1986) 179 Cal.App.3d 500, 509.)

The determination of whether a party is entitled to expenses under section 2033.420 is within the sound discretion of the trial court.  "More specifically, '[s]ection 2033[.420] clearly vests in the trial judge the authority to determine whether the party propounding the admission thereafter proved the truth of the matter which was denied.'" (*Stull, supra,* 92 Cal.App.4th at p. 864.)  We review the trial court's determination for an abuse of that discretion. (*Brooks v. American Broadcasting Co., supra,* 179 Cal.App.3d at p. 508.)  "An abuse of discretion occurs only where it is shown that the trial

51

court exceeded the bounds of reason." (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 972.)

B.    *Background*

After the trial, VMS filed a motion for cost of proof sanctions pursuant to section 2033.420, seeking reimbursement of the expenses it incurred in proving the truth of facts denied by defendants in seven requests for admission. Plaintiffs propounded this set of requests for admission on Rizal on May 31, 2012.[21] At issue here are requests for admission number 26, which asked Rizal to "[a]dmit YOU failed to comply with Association Rules," and number 27, which asked Rizal to "[a]dmit Bankard failed to comply with Association Rules." Rizal responded on July 3, 2012. Rizal's response included objections and unqualified denials of request numbers 26 and 27.

The court granted plaintiffs' motion with respect to request numbers 26 and 27 on July 15, 2018. Although it noted that defendants "put [plaintiffs] to proof at trial on a number of matters that were ultimately uncontested— such that the trial could have been significantly shortened," the court concluded that only the denials to request numbers 26 and 27 met the standard under section 2033.420. Specifically, the court found plaintiffs proved that defendants did not comply with the Associations' rules and that the matter was "effectively conceded" by defendants. The court pointed to the fact that defendants were suspended by the Associations for violating the Associations' rules and that at trial, defendants "did not argue the suspension was erroneous or that they did not violate the rules." The court also noted that defendants' expert testified that defendants had violated the Associations' rules by processing plaintiffs' transactions without a signed contract in place and delegating the obligation to pay to a third party, here, Grupo Mercarse. Additionally, the court pointed to defendants' concession

---

[21]At the time the discovery was propounded, Bankard was challenging jurisdiction in the case through a still-pending motion to quash. On May 25, 2012, the court granted plaintiffs' request to conduct jurisdictional discovery related to the motion to quash, noting that plaintiffs had agreed to limit discovery to Bankard to jurisdictional matters. Thus, plaintiffs addressed these discovery requests only to Rizal.

during closing argument that Bankard "failed to sign one contract" (the VII TMA), but argued that the failure did not matter.

The court also concluded that the matters at issue were of substantial importance to plaintiffs' case, reasoning that "[i]f plaintiffs did not establish that defendants acted in violation of rules by (a) delegating obligations to the third parties that committed the fraud, and (b) making payments without a contract in place, then, at a minimum, defendants would have had an argument that handing over all the account processing to third parties was an acceptable business practice that was not negligence . . ., and defendants would have had a stronger argument that they had no reason to expect that Grupo Mercarse or Conway would act in a wrongful manner on their behalf." The court further found that defendants had no reasonable ground, even in 2012, to believe that they could prevail in showing that they did not violate any of the Associations' rules, given Bankard's suspension in 2006 and Talbot's admission that defendants violated the rules in failing to sign the VII TMA. The court also rejected defendants' contention that they were justified in their denials based on their objections to the requests, noting that the objections "do not excuse a flat denial; at most they would support a qualified denial or admission that explains how defendants are interpreting the RFA."

In a subsequent order, the court awarded $80,658.75 as appropriate cost of proof sanctions to plaintiffs. Defendants do not challenge the calculation of this amount on appeal.

C.    *Analysis*

Defendants first contend the trial court erred in finding that plaintiffs had proved that defendants violated the Associations' rules. However, they acknowledge that their expert "agreed that Bankard violated the rules by processing under the [VII TMA] without having a signed contract in place." Defendants cannot possibly demonstrate error on an issue they have conceded. Their attempt to argue that only Bankard, not Rizal, committed any violations, even if valid, does not excuse the response to request number 27, in which Rizal denied that Bankard had violated any of the Associations' rules.

Defendants also argue that the trial court erred in concluding that their violation of the Associations' rules was of substantial importance to the trial, because "VMA has conceded and it is beyond dispute that the [VII TMA] did not cause the loss and, thus, what happened with this contract is irrelevant." Defendants provide no citation for this purported concession. We rejected this argument above. Further, contrary to defendants' assertion, plaintiffs argued repeatedly that the VII TMA contract was not the only applicable contract between the parties in this case, and that defendants' failure to sign the contract, while continuing to process transactions under the problematic version they received from Conway, was at least partially responsible for plaintiffs' damages.

We also find no error in the trial court's conclusion that defendants had no reasonable ground to believe they would prevail in the claim that they had not violated any of the Associations' rules. Although defendants cite to testimony by their witnesses that they believed the suspension was unjustified because Bankard was improving, none of those witnesses contested that Bankard had violated the Associations' rules. Additionally, as the trial court noted, to the extent Rizal desired to rely on its objections that the requests were overbroad and ambiguous, or that request number 27 was improper as non-jurisdictional discovery related to Bankard, it could have done so or offered a qualified response. But because defendants issued a denial and later conceded the truth of the request, the court was well within its discretion to award plaintiffs their costs of proof.

## VI. *Plaintiffs' Appeal: Punitive Damages*

Plaintiffs contend the trial court erred in granting the motion for JNOV on the issue of punitive damages, and its finding that Conway was not a managing agent within the meaning of Civil Code section 3294, subdivision (b) (section 3294(b)). We affirm.

### A. *Legal Standards*

Civil Code section 3294, subdivision (a) permits an award of punitive damages "for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Section 3294(b) provides that a corporate employer is not liable for punitive damages based upon the acts of its

employees unless the acts were committed, authorized, or ratified by a corporate officer, director, or managing agent.

We review an award of punitive damages for substantial evidence. In evaluating the sufficiency of the evidence to support a finding made under the clear and convincing evidence standard, as with punitive damages, the court "must make an appropriate adjustment to its analysis" to reflect the higher standard of proof before the trial court. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989 (*O.B.*).)[22] Thus, the question before us is "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Id.* at p. 1011.) We "view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at pp. 1011-1012.) Similarly, as discussed above, we review an order granting or denying JNOV by "determining whether it appears from the record, viewed most favorably to the party securing the verdict, that any substantial evidence supports the verdict." (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284; see also e.g., *Wright v. City of Los Angeles, supra,* 219 Cal.App.3d at p. 343.)

B.  *Background*

The jury was instructed with CACI No. 3944 regarding punitive damages as follows: "If you decide that any of Rizal's and/or Bankard's agents' conduct caused VMS' or VII's harm, you must decide whether that conduct justifies an award of punitive damages against them for their agents' conduct. At this time you must decide whether VMS and/or VII have proved by clear and convincing evidence that Rizal's and/or Bankard's agents engaged in that conduct with malice, oppression, or fraud. . . . VMS and/or VII must also prove one of the following by clear and convincing evidence: 1. That Rizal's and/or Bankard's agents were officers, directors, or managing

---

[22]The court in *O.B.* resolved a split of opinion on the appropriate level of review of a factual finding made by clear and convincing evidence. Although the trial court here did not have the benefit of that ruling, it applied the correct standard under the line of cases ultimately approved in *O.B.*

agents of Rizal and/or Bankard who were acting on behalf of Rizal and/or Bankard; or . . . 3. That an officer, a director, or a managing agent . . . authorized Rizal's and/or Bankard['s] agents' conduct; or 4. That an officer, a director, or a managing agent . . . knew of Rizal's and/or Bankard's agents' wrongful conduct and adopted or approved the conduct after it occurred. An employee is a 'managing agent' if he or she exercises substantial independent authority and judgment in his or her corporate decision making such that his or her decisions ultimately determine corporate policy."

The jury awarded $7.5 million in punitive damages to VMS. In their motion for JNOV, defendants argued that the punitive damages award was not supported by substantial evidence  Plaintiffs did not address punitive damages in their opposition to JNOV. However, in opposing the motion for new trial, plaintiffs argued that the jury properly found Conway was a managing agent because defendants "ceded to Mercarse and Conway, et al. all authority . . . to manage a host of merchants, including VMS."

In its ruling on defendants' motion for JNOV, the court rejected defendants' argument that there was insufficient evidence that Conway acted with fraud. However, the court agreed with defendants that there was insufficient evidence an officer, director, or managing agent of defendants authorized or ratified Conway's conduct to support a punitive damages award. The court noted that plaintiffs failed to address this argument in their opposition to JNOV or directly address the requirements for punitive damages during closing argument at trial. However, the court stated it had considered plaintiffs' arguments on this issue made in their opposition to the motion for new trial.

Taking the evidence in the light most favorable to plaintiffs, the court found there was "no evidence at trial that a corporate officer or director knew of, authorized, or ratified Conway's fraud. Thus, the question appears to be whether Conway was a 'managing agent' for purposes of" section 3294(b). The court relied on *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 577 (*White*), for the proposition that a managing agent for punitive damages purposes requires a showing that "the employee exercised substantial discretionary authority over significant aspects of a corporation's business." The court concluded the evidence was insufficient to meet that burden as to

Conway, noting that "her work did not involve 'formal policies that affect a substantial portion of the company' or 'substantial discretionary authority over significant aspects of a corporation's business.'" The court also noted that defendants were "a large banking company," with a net worth of over a billion dollars. Although plaintiffs argued that defendants put Conway in charge of processing the transactions of over 120 online merchants, the court found that this evidence that Conway was in charge of "a modest portion of a large company" could not "bear the weight of a conclusion that Conway or an associate is making formal policies that affect a substantial portion of the company and that are the type likely to come to the attention of corporate leadership to justify punishing the entire company for fraud."

C. *Analysis*

Plaintiffs contend the trial court erred in concluding there was no substantial evidence from which the jury could have found that Conway was a managing agent, or that defendants' officer or director ratified or approved Conway's conduct. We disagree.

Generally, "principal liability for punitive damages [does] not depend on employees' managerial level, but on the extent to which they exercise substantial discretionary authority over decisions that ultimately determine corporate policy." (*White, supra,* 21 Cal.4th at pp. 576–577.) Thus, to establish that an individual is a managing agent, a plaintiff seeking punitive damages must show that "the employee exercised substantial discretionary authority over significant aspects of a corporation's business." (*Id.* at p. 577; see also *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 715; *Cruz v. HomeBase* (2000) 83 Cal.App.4th 160, 167–168 ["'corporate policy' is the general principles which guide a corporation, or rules intended to be followed consistently over time in corporate operations," and thus "[a] 'managing agent' is one with substantial authority over decisions that set these general principles and rules"].) The key inquiry thus concerns the employee's authority to change or establish corporate policy. (*Myers v. Trendwest Resorts, Inc.* (2007) 148 Cal.App.4th 1403, 1437; see also *CRST, Inc. v. Superior Court* (2017) 11 Cal.App.5th 1255, 1273

Plaintiffs contend the trial court used an incorrect standard. We disagree. Citing to the court's language that Conway managed "a modest

portion of a large company," plaintiffs attempt to cast the trial court's reasoning as requiring a strict "quantitative showing as to the percentage of the defendants' overall business the agent's particular authority represents." We do not view the trial court's reasoning as improper. The court focused on the evidence of defendants' large size, compared to the small amount of business managed by Conway, as well as the lack of evidence that Conway's work involved any formal policies for defendants. This analysis is squarely in line with the requirement under *Ultramar* that a managing agent have the ability to affect a "substantial portion" of defendants' business and is similarly reflected in the jury instructions given here.

Plaintiffs also briefly argue that even if the court's standard for a managing agent was legally correct, the court could not rely on it to grant the JNOV, as the jury was never instructed that it should analyze "(1) whether Conway's work involved 'formal policies that affect[ed] a substantial portion of the company,' and (2) whether Conway had 'substantial discretionary authority over significant aspects of [the Bank's] business.'" The jury was instructed that an employee is a managing agent if "he or she exercises substantial independent authority and judgment in his or her corporate decision making such that his or her decisions ultimately determine corporate policy." Plaintiffs fail to provide either an explanation or citation to authority suggesting how the agreed-upon jury instruction was inconsistent with the standard applied by the court.

Furthermore, we conclude that there was insufficient evidence from which the jury could have found it highly probable that Conway was defendants' managing agent.[23] Viewed in the light most favorable to the verdict, the evidence suggested that Conway managed the bank's processing relationships with most of its roughly 124 card-not-present merchants, assuming several roles through her various entities. However, there was no

---

[23]However, we reject defendants' contention that Conway could not be a managing agent because she was not an employee. Defendants did not raise this argument below, nor did they request a corresponding jury instruction. Moreover, defendants ignore the cases finding a third party was a managing agent under section 3294(b). (See *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1220 (*Major*) [holding that third party claims adjuster could be a managing agent of insurer defendant].)

evidence at trial that Conway had any role in making formal policies that affected a *substantial* portion of defendants' company. While Conway's position as an outside agent may not have automatically excluded her as a potential managing agent, it certainly did not position her as able to affect significant aspects of defendants' banking business, nor do plaintiffs point to any evidence to suggest otherwise. Thus, we agree with the trial court that the evidence does not support the conclusion that Conway held a sufficient level of authority to "justify punishing the entire company for fraud." (See *Roby v. McKesson Corp.*, *supra*, 47 Cal.4th at pp. 714–715 ["When we spoke in *White* about persons having 'discretionary authority over . . . corporate policy'[ ], we were referring to formal policies that affect a substantial portion of the company and that are the type likely to come to the attention of corporate leadership. It is this sort of broad authority that justifies punishing an entire company for an otherwise isolated act of oppression, fraud, or malice."].)

The cases cited by plaintiffs reflect instances of broader decision making authority and therefore are distinguishable. For example, in *Major, supra,* 169 Cal.App.4th at p. 1220, the court found a regional manager for a third party claims adjuster was a managing agent, where the adjuster was hired by the defendant insurer to handle "a significant aspect" of the defendant's business: the claims handling functions for the entire business. The regional manager "managed 35 employees in an office in Minnesota that handled claims as far away as California, oversaw the claims operation, supervised lower ranking supervisors, trained adjusters, worked on the budget, supervised the handling of certain files, and authorized payment of benefits." (*Ibid.*; see also *Mazik v. Geico General Ins. Co.* (2019) 35 Cal.App.5th 455, 465-466 [finding that regional liability administrator was a managing agent of insurer, where administrator had "wide regional authority over the settlement of claims" and "broad decisionmaking responsibility for establishing GEICO's settlement standards"]; *Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp., U.S.A.* (2013) 221 Cal.App.4th 867, 886 [regional sales manager for four states was managing agent where he managed between 140 and 240 dealerships, a group of "district managers"

and was "ultimately responsible for the total well-being of Yamaha Motor Corporation Dealers"].)

Alternatively, plaintiffs argue there was sufficient evidence for the jury to award punitive damages based on a finding that defendants ratified Conway's conduct. Plaintiffs acknowledge that they did not expressly argue ratification during closing argument. Despite this, they contend the jury could have found, based on the evidence, that a bank officer or director adopted and approved Conway's conduct.

We are not persuaded. Plaintiffs' argument regarding ratification focuses on two pieces of evidence: 1) defendants' decision to process transactions without signing the VII TMA; and 2) defendants' transfer of money to CNP under the indemnity agreement, purportedly for payment of taxes owed by the merchants. On the first point, although defendants admitted they did not sign the VII TMA, there was no evidence that defendants knew Conway had supplied them with a different version of the agreement, including changes to the rates charged, or that she was pocketing some of the money they paid for plaintiffs' transactions. Plaintiffs' representatives testified that their processing with defendants (including where they sent the transactions and where they received payment) remained unchanged after plaintiffs signed the VII TMA. Thus, plaintiffs' own evidence does not support a finding that defendants ratified Conway's misconduct by continuing to process transactions without signing the VII TMA.

Second, plaintiffs point to defendants' decision to sign the indemnity agreement with CNP and pay CNP money that plaintiffs claim was due to merchants. But at most, defendants owed plaintiffs $23,000. Plaintiffs' suggestion in their appellate brief that defendants transferred "$1.1 million of [plaintiffs'] money" to CNP is therefore meritless. Even assuming none of the money was actually paid to settle tax liabilities, there was no evidence that defendants knew the tax liabilities would not be paid, and plaintiffs' contentions are contrary to the language of the indemnity agreement.

Under these circumstances, it is not highly probable that the jury could reasonably conclude that defendants ratified Conway's misconduct. We

therefore conclude that the court did not err in granting the motion for JNOV as to punitive damages.[24]

## DISPOSITION

The judgment and post-judgment orders are affirmed.  The parties are to bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


WILLHITE, ACTING P.J.


CURREY, J.

---

[24]Thus, we need not reach defendants' contentions that the claim for punitive damages was forfeited, barred by the statute of limitations, or that there was insufficient evidence of malicious conduct to support the jury verdict.